652 A.2d 299

COMMONWEALTH of Pennsylvania, Appellee,

v.

Charles MANCE, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 20, 1994.

Decided Jan. 11, 1995.

284

Paul D. Boas, Berlin, Boas & Isaacson, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Kemal A. Mericli, Asst. Dist. Atty., for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

Appellant, Charles Mance, appeals from the Order of the Superior Court affirming his conviction and judgment of sen-

tence for criminal solicitation [1] and criminal attempt.[2] Mance was the target of a reverse sting operation in which undercover police officers arranged to sell him one hundred pounds of marijuana. In a reverse sting, law enforcement personnel act as sellers and use various techniques to promote the sale of illegal goods and services. We granted allowance of appeal in this case to review the propriety of the tactics used by police in arresting Mance.

The series of events which culminated in Mance's arrest have been ably summarized by the Superior Court:

Mance was telephoned in late December, 1987, or early January, 1988, by an acquaintance, Rocco Scarfone, who had become a paid informer for Detective Steven Medley, an undercover narcotics officer for the Fort Lauderdale, Florida, police. Scarfone testified that during the first telephone conversation, Mance asked him whether he knew if any marijuana was available. While Scarfone told Mance that he would see if any marijuana was available, in actuality, he reported the inquiry to Medley. Medley instructed Scarfone what Mance should be told when Scarfone called Mance back.

Scarfone testified that he had one or two additional telephone conversations with Mance before establishing a three-way conversation with Medley, who pretended to be the seller of the marijuana. It is undisputed that the initial calls between Scarfone and Mance were not recorded. There were three telephone conversations, secretly recorded, between Scarfone, Mance, and Medley. These three-way conversations disclose Mance negotiating the sale and delivery of the 100 pounds of marijuana for $50,000. Mance also agreed to fly to the Charlotte, North Carolina, airport to sample the marijuana he was buying, and to give Medley $1000 in expense money, with delivery of the 100 pounds to be made later in Pittsburgh.

1. 18 Pa.C.S. § 902(a).
2. 18 Pa.C.S. § 901(a).

The meeting at the Charlotte airport, also secretly recorded, occurred as planned. Two days later Scarfone, accompanied by various law enforcement agents, came to Pittsburgh and met with Detective William Joyce of the narcotics section of the Pittsburgh Police. Joyce became the team leader for the finale. Ostensibly arranging for the delivery of the marijuana, Scarfone, in another recorded conversation, called Mance at his home and told him where Mance could meet Scarfone and the driver (actually an undercover agent) to complete the deal. Mance came to the designated meeting spot, displayed the money, and after the government agent agreed to exchange the marijuana at Mance's house, Mance was arrested.

Mance testified that when he had first met Scarfone a number of years earlier, Scarfone bragged about his connections with organized crime and ability to supply illicit drugs. According to Mance, Scarfone had pressured him into buying some cocaine after Scarfone had provided Mance with a discounted hotel room and rental car in Florida. Through the ensuing years, Mance secured a college degree, obtained a good job with Westinghouse Electric Corporation, got married and had children. Mance claimed that Scarfone had called him some eight or ten times, starting in October, 1987. Mance testified that when Scarfone telephoned him toward the end of 1987, he told Mance that he was in financial trouble because he couldn't pay the money he owed to some "big people," who were threatening him. If Mance could help Scarfone sell their marijuana, it would reduce Scarfone's debt. Mance asserted that he agreed to purchase the marijuana in order to help Scarfone.

*Commonwealth v. Mance,* 422 Pa.Super. 584, 587–88, 619 A.2d 1378, 1379–80 (1993).

On appeal before this Court, Mance raises several issues concerning the constitutionality of reverse sting operations and the use of such tactics in his particular case. Mance first argues that law enforcement authorities must make a preliminary showing based on articulable facts that the individual who is the target of a reverse sting is engaged in illegal drug

activity. He asserts that the absence of such a showing violates his right to due process under the federal and state constitutions. We disagree.

Mance cites the recent United States Supreme Court decision *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), as support for his claim that law enforcement personnel must have some basis for selecting an individual as the target of their investigation before undertaking further action. In *Jacobson,* a reverse sting case, the defendant was convicted of receiving child pornography through the mails. The defendant maintained that he had been entrapped into committing the crime through the government's use of a twenty-six month campaign of mailings and communications from undercover agents and fictitious organizations. In a 5–4 decision, the Supreme Court reversed the conviction "[b]ecause the Government overstepped the line between setting a trap for the 'unwary innocent' and the 'unwary criminal,' and as a matter of law failed to establish that [the defendant] was independently predisposed to commit the crime for which he was arrested." *Id.* at ——, 112 S.Ct. at 1537, 118 L.Ed.2d at 180 (citation omitted).

■ A closer look at the *Jacobson* case not only contradicts Mance's contention that police must have reasonable suspicion before commencing an investigation, but supports the contrary proposition. Prior to the grant of certiorari by the Supreme Court, the primary issue before the Eighth Circuit was whether the government must have some minimum level of suspicion before it can begin an investigation. *United States v. Jacobson,* 916 F.2d 467 (8th Cir.1990) (en banc), *rev'd on other grounds, Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). The Eighth Circuit affirmed the defendant's conviction holding that "the [federal] constitution does not require reasonable suspicion of wrongdoing before the government can begin an undercover investigation." *Id.* at 469. Thus, the court concluded that "when the government's investigatory conduct does not offend due process, the mere fact the undercover investigation is started without reasonable suspicion 'does not bar the conviction of those who

288

rise to its bait.'" *Id.* (quoting *United States v. Jannotti,* 673 F.2d 578, 609 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Accordingly, there is no federal constitutional requirement that police have reasonable suspicion of illegal activity before they initiate an undercover investigation.[3]

Mance also makes an abstract reference to Article 1, §§ 1 and 9 of the Pennsylvania Constitution,[4] but fails to identify any interest which would compel an extension of the due process rights under the Pennsylvania Constitution beyond those already provided by the federal constitution.[5] We

3. Jacobson continued to argue before the Supreme Court that the government did not have reasonable suspicion in order to begin an investigation. However, the Court did not grant certiorari on this issue as evidenced by the following exchange between Justice O'Connor and Jacobson's attorney, Mr. Moyer:

> Justice O'Connor: Do you take the position that the government must always prove predisposition by pointing to events that occurred before the sting?
> Moyer: Yes.
> O'Connor: Isn't that the same as requiring reasonable suspicion beforehand that the target was inclined to commit the crime?
> Moyer: Yes.
> O'Connor: But we didn't grant cert. on that question.

60 U.S.L.W. 3394 (1991).

4. Article I, § 1 provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. Article I, § 9 provides:

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.

Pa. Const. art. I, § 9.

5. The full discussion devoted to Mance's claim under the Pennsylvania Constitution consists of the following: "Article I, § 1 of the Pennsylvania Constitution discusses the inherent right of people to possess and

therefore decline to require that law enforcement authorities have reasonable suspicion of an individual's illegal activity prior to commencing an undercover investigation. "To hold otherwise would give the ... judiciary an unauthorized 'veto over law enforcement practices of which it [does] not approve.'" *United States v. Jacobson,* 916 F.2d 467, 469 (8th Cir.1990) (en banc), *rev'd on other grounds, Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (quoting *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366, 375 (1973)).

▆▆▆ Mance next contends that the police tactics employed in the reverse sting operation that resulted in his arrest were such that he was entrapped as a matter of law or, in the alternative, his due process rights were violated. The Superior Court considered the claim that Mance was entrapped as a matter of law and found that "[t]he testimony of the informant, Scarfone, and the testimony of Mance [were] in sharp conflict on the matter of whether Mance voluntarily entered into the illicit drug transaction or whether the illicit drug transaction was improperly induced by Scarfone." *Commonwealth v. Mance,* 422 Pa.Super. at 590, 619 A.2d at 1380. The court correctly concluded that where there is conflicting testimony as to the subject of inducement, the jury must resolve the conflict. *Id.* at 590, 619 A.2d at 1381; *see Commonwealth v. Weiskerger,* 520 Pa. 305, 313, 554 A.2d 10, 14 (1989). Because it was a matter for the jury to decide as the finder of fact, there can not be entrapment as a matter of law. Thus, Mance's claim is without merit.

Mance presents a somewhat more compelling argument in his claim that his due process rights were violated as a result

protect their property and reputation, and to pursue their own happiness, and Article I, § 9 talks about due process. This clearly embodies ... 'the right to be left alone[,]'" and

[a]lthough one gives up his right to be left alone and to pursue his own happiness pursuant to Article I, §§ 1 and 9 when law enforcement has a reason to believe he is engaged in criminal activity, one should not be subject to having those rights invaded simply at random or through the suspect motivations of a rather seedy informant.

Brief for Appellant at 19, 22.

of the police tactics used in the reverse sting operation that lead to his arrest. He specifically takes exception to the use of an unsupervised informant who supplied him with drugs and was working with the police on a contingent fee basis. Mance claims that, taken as a whole, the actions of the police in this case constitute outrageous conduct such that he was denied due process, and therefore, his conviction should be reversed. We disagree.

■ Although the Superior Court has previously considered the due process defense, it is an issue of first impression before this Court. The defense is distinct from entrapment and is based on the theory that "police involvement in criminal activity may be so outrageous that a prosecution will be barred on due process grounds." *Commonwealth v. Mathews,* 347 Pa.Super. 320, 321, 500 A.2d 853, 854 (1985). " 'The question whether government conduct has been so outrageous as to constitute a violation of due process is a question of law to be determined by the court, not a jury.' " *Commonwealth v. Mance,* 422 Pa.Super. at 591, 619 A.2d at 1381 (quoting *Commonwealth v. Benchino,* 399 Pa.Super. 521, 526, 582 A.2d 1067, 1069 (1990)).

In rejecting Mance's claim that the police conduct in this case constituted outrageous conduct, the Superior Court relied on its decision in *Commonwealth v. Benchino,* 399 Pa.Super. 521, 582 A.2d 1067 (1990). In *Benchino,* the court conducted a thorough review of federal decisions involving outrageous government conduct and the due process defense, and concluded that "criminal investigations will be found to violate due process 'only in the rarest and most outrageous circumstances.' " *Id.* at 527, 582 A.2d at 1069 (citations omitted). The appellant in *Benchino* alleged outrageous government conduct where an arrested drug dealer, who was cooperating with the Commonwealth, indicated to the appellant that he wanted him to repay a large debt related to drug transactions that took place over one year earlier. The appellant and the dealer subsequently agreed that a third party (an undercover narcotics officer) would deliver cocaine to the appellant so that he could sell it and repay the debt. After reviewing the

analysis of various federal jurisdictions as well as the circumstances surrounding the investigation and arrest of the appellant, the Superior Court could find "no basis for holding that the investigatory techniques employed by the Commonwealth were so outrageous as to violate due process." *Id.* at 532, 582 A.2d at 1072.

■ We find the Superior Court's well-reasoned analysis in *Benchino* to be applicable to the facts of the instant case. We note that it can be fairly observed that the methods of inducement employed by the confidential informant in the instant case do not rise to the level of those used by the informant in *Benchino*. Mance's initial complaint with the police tactics used in this case is that the informer, Rocco Scarfone, was an untrained person who was permitted to initiate contact with suspected drug offenders without police supervision. Mance argues that during the initial conversations between Scarfone and himself, the police had no way of knowing how many times Scarfone called Mance; what methods of inducement Scarfone used on Mance; whether Mance had any initial interest in buying marijuana; or what appeals Scarfone made to Mance. However, Mance does not allege that anything improper occurred during those conversations, but simply that the police did not supervise Scarfone during the preliminary conversations that resulted in the illegal drug transaction. Mance, in effect, would have this Court adopt a *per se* rule that prohibits a confidential informant from interacting with a potential subject of an undercover investigation without the prior direction and approval of the government. This we are not willing to do. The law provides sufficient protections and remedies to prevent improper methods of government persuasion and overreaching, none of which have been alleged here. Accordingly, we reject the claim that Mance's due process rights were violated simply because the police did not monitor the content and manner of the initial conversations between Mance and Scarfone.

■ We are likewise unpersuaded that Mance's due process rights were violated when law enforcement officials provided

Mance with a sample of marijuana and offered him the opportunity to make a substantial profit from the illegal transaction.[6] As the Superior Court stated in *Benchino*, "[t]he government . . . does not violate due process merely . . . because its agents supply ingredients for commission of a crime or contraband to a defendant." *Id.* at 528, 582 A.2d at 1070 (citing cases). In the instant case, it was reasonably necessary for the police to supply Mance with a sample of the marijuana that he would be buying in order to successfully maintain the credibility of the confidential informant and the police officers participating in the investigation. Additionally, the potential windfall that Mance expected to receive from the illegal drug transaction does not support a finding that his right to due process was violated; indeed monetary gain is the essential motivating force that drives sellers in a black market economy. Thus, we conclude that the marijuana sample given to Mance and the opportunity for large profit offered by the police do not support Mance's claim that his right to due process was violated.

█ Finally, we must address Mance's claim that the police use of an informant who was paid a contingent fee violates due process under the state and federal constitutions. In the instant case, the informant, Scarfone, was paid a total of $1,500 ($500 from the Fort Lauderdale Police, $500 from the Pittsburgh Police, and $500 from the DEA) prior to Mance's trial for his participation in the reverse sting operation. *Commonwealth v. Mance*, No. CC8802338, slip op. at 3 (C.P. Allegheny County November 18, 1991); (Reproduced Record at 53a). In addition, Scarfone received favorable treatment with respect to certain fraud charges that were pending against him. *Commonwealth v. Mance*, No. CC8802338, slip op. at 3; (Reproduced Record at 253a).

Based on our review of the record, we disagree with Mance's characterization of the monies paid to Scarfone as a

6. The police offered Mance one hundred pounds of marijuana for $50,000, or $500 per pound. The street price of marijuana in Pittsburgh at that time was $1,200 to $1,500 per pound. *Commonwealth v. Mance*, 422 Pa.Super. at 592, 619 A.2d at 1381.

contingent fee. Scarfone entered into a written agreement with the Fort Lauderdale Police which expressly stated that his compensation was "not in any manner contingent upon either the success of any criminal prosecution against any individual or entity or the success of any civil proceeding involving the forfeiture of any property that may be seized." (Reproduced Record at 117a). Likewise, Scarfone's payment was not contingent upon his testimony in either a criminal or civil proceeding. (Reproduced Record at 117a–118a). The record indicates that Scarfone received compensation for setting up the drug deal between Mance and law enforcement authorities and that Scarfone was paid shortly after Mance's arrest. (Reproduced Record at 53a, 113a, 331a–333a). It is apparent that Scarfone's payment was not contingent upon Mance's conviction or Scarfone's testimony at trial. *See United States v. Shearer*, 794 F.2d 1545 (11th Cir.1986) (fee paid to informer before defendant's trial was not contingent on conviction and therefore did not violate due process rights). Scarfone's role in the reverse sting was nothing more than that of facilitator between the police and Mance. The fact that Scarfone was compensated for his involvement in the investigation was a matter that the jury was free to consider in assessing the credibility of Scarfone as a witness. Thus, we conclude that Mance's due process rights were not violated when law enforcement authorities paid a fee to Rocco Scarfone for his participation in the reverse sting that resulted in Mance's arrest.

Accordingly, the Order of the Superior Court is affirmed.

MONTEMURO, J., is sitting by designation.