963 A.2d 396

COMMONWEALTH of Pennsylvania, Appellant

v.

Frederick SNYDER, Appellee

Commonwealth of Pennsylvania, Appellant

v.

Gary Lee Gerber, Jr., Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Group Two Properties, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Dale Smith, Appellee.

Supreme Court of Pennsylvania.

Argued April 16, 2008.

Decided Jan. 22, 2009.

Christopher D. Carusone, Esq., Richard A. Sheetz, Esq., Amy Zapp, Esq., Thomas W. Corbett, Jr., Esq., Office of the Attorney General, for Commonwealth of Pennsylvania.

Kurt Edward Klapkowski, Esq., Michael David Buchwach, Esq., Susan P. Shinkman, Esq., PA Department of Environmental Protection, Harrisburg, for amicus curiae PA Department of Environmental Protection.

Lawrence J. Hracho, Esq., Hracho & Landis, Reading, for Frederick Snyder, Group Two Properties, and Dale Smith.

Emmanuel H. Dimitriou, Esq., Kurt Geishauser, Esq., Dimitriou & Geishauser, P.C., Reading, for Gary Lee Gerber, Jr.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## *OPINION*

Justice TODD.

In this appeal we are asked to determine whether the lower courts erred in finding Appellees' federal due process rights were violated, and thus suppressing evidence against them based on our decision in *Commonwealth v. Deans*, 530 Pa. 514, 610 A.2d 32 (1992), in light of the United States Supreme Court's subsequent pronouncement in *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004). For the reasons which follow, we reverse.

Beginning in January 2001, Appellee Group Two Properties ("Group Two") owned a dirt lot in Reading, Pennsylvania, which previously had been the property of Reading Industrial Scrap, Inc. ("RISCO"). At the time in question, Appellee Frederick Snyder served as Chief Executive Officer of Group Two and Vice President of Group One Properties ("Group One"). Appellee Gary Lee Gerber, Jr., owned Mount Carbon Industries, who Snyder had hired to clean up the RISCO property. Appellee Dale Smith, a Group One employee, told the Attorney General's office he served as a "go-fer" for Snyder, but was introduced to Gerber as the site manager.

While Gerber initially had been instructed to transport the waste to sites in Morgantown, West Virginia, Blandon, Pennsylvania, and Temple, Pennsylvania, Snyder missed his first payment and, according to Gerber, subsequently ordered the waste buried on the property rather than transported offsite. Gerber claims Smith told him the company had obtained the necessary permits from the Department of Environmental Protection ("DEP").

After conducting an investigation, DEP concluded none of the relevant individuals had permits to dispose of solid waste on the property. *See* Affidavit of Probable Cause at ¶ 21, R.R. at 81a. DEP referred the matter to the Attorney General's office, alleging illegal burial activity was being conducted. Between August 21 and 26, 2002, the Attorney General's office executed a search warrant on the property and removed, *inter alia*, 199 drums which had been buried in the ground and certain soil samples which were later tested. DEP tested the samples using the Toxicity Characteristic Leaching Procedure ("TCLP"), authorized for that purpose by the United States Environmental Protection Agency ("EPA") in 40 C.F.R. § 261.24 and implemented into Pennsylvania law by 25 Pa. Code § 261a.1.[1] According to the Commonwealth's affidavit of probable cause, the tests indicated levels of silver and lead were present in the soil samples which exceeded the limits set out in the Solid Waste Management Act, 35 P.S. §§ 6018.101 *et seq.* ("the Act"). Specifically, the Commonwealth alleged Sample # 2981434 had a concentration of 1294 mg/l of lead; Sample # 2367364 had a concentration of 12.1 mg/l of silver; Sample # 2994537 had a concentration of 52.3 mg/l of lead and 10 mg/l of silver; Sample # 2994541 had a concentration of 10.7 mg/l of lead; Sample # 2994545 had a concentration of 21.1 mg/l of lead; and Sample # 2994524 had a concentration of 14.2 mg/l of lead. *See* 40 C.F.R. § 261.24 Table 1 (setting the maximum permissible concentration of both silver and lead at 5 mg/liter).

After conducting TCLP tests, DEP disposed of the samples. The Commonwealth then brought charges against Appellees for violations of the Act and, in pretrial motions, Appellees moved to suppress the test results because the samples had been destroyed, arguing under our decision in *Deans, supra*, the destruction of the samples violated their federal due process rights and thus required suppression. Reasoning *Deans* requires "the defendant in a criminal case [be provided]

1. That section reads, in pertinent part, "Except as expressly provided in this chapter, 40 C.F.R. Part 261 and its appendices (relating to identification and listing of hazardous waste) are incorporated by reference."

an opportunity to conduct an expert examination of physical evidence that is critical to the issue of guilt," the trial court granted the motion. Trial Ct. Op., 6/21/05, at 4. The court noted remediation of the site had begun by the time charges were filed, so Appellees could not obtain identical evidence; found the TCLP does not produce consistent results; and held though Appellees had access to the site and performed additional tests, those results did not constitute "comparable evidence" under *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).[2] Accordingly, the trial court suppressed the TCLP test results.

The Commonwealth appealed and filed a *Dugger* statement, certifying the trial court's decision would terminate or substantially handicap the instant prosecution. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985); *see* Pa.R.A.P. 311(d). After hearing argument, a unanimous three-judge panel of the Commonwealth Court affirmed in an unpublished opinion. The court concluded the Commonwealth had sought to use the evidence at trial; the trial court was within its discretion in finding the evidence in question was not exceedingly reliable; and, under our decision in *Deans*, those facts required suppression. The court rejected the Commonwealth's argument that *Fisher*, *supra*, which we discuss further below, nonetheless forbade suppression of the results of tests performed on destroyed samples unless the samples were destroyed in bad faith, reasoning that, in *Fisher*, the evidence which had been destroyed had been subjected to a test which "possess[ed] a high degree of reliability." *Commonwealth v. Snyder, Gerber, Group Two Properties and*

---

**2.** The trial court wrote:

[T]he other test results would be subject to attack by the Commonwealth on the grounds that tests performed on soil selected by the defendants or defendants' agent, Peduto, does not refute the tests performed on the soil samples seized by the Commonwealth. In other words, the defendants' ability to test other soil found at the site neither verifies nor negates the Commonwealth's TCLP test results on the soil sample seized by the DEP between August 21 and August 26, 2002. Only a subsequent independent test on the actual soil seized by the Commonwealth protects [Appellees'] due process rights.

Trial Ct. Op., 4/21/05, at 6, Finding of Fact # 18.

*Smith,* Nos. 1009, 1010, 1011, and 1012 C.D.2005, unpublished memorandum at 6 (Pa.Cmwlth. filed June 27, 2006). The court also noted that in *Fisher* the evidence at issue had been destroyed two months before Fisher was arrested, but ten years after the trial at which he had failed to appear. *Id.* Here, in contrast, the evidence "became unavailable before criminal charges were filed." *Id.* at 5.

Before both the trial court and the Commonwealth Court, the Commonwealth, in addition to *Fisher,* relied on *Trombetta, supra,* to argue no due process violation took place, and so suppression was inappropriate. As we discuss more fully below, in *Trombetta,* the high Court held the results of DUI breathalyzer tests were admissible in evidence even though the breath samples themselves had been destroyed because the samples were only potentially useful, not materially exculpatory, and had not been destroyed in bad faith. The Commonwealth argued the soil samples were also only potentially useful to the defendants and, under *Trombetta,* the results of tests performed on such evidence are only subject to suppression if the evidence possessed a clear exculpatory value and the defendant would be unable to obtain comparable evidence by other means. Here, they averred, the trial court found the samples were not destroyed in bad faith and Appellees had access to comparable evidence.

We granted the Commonwealth's Petition for Allowance of Appeal to consider whether the Commonwealth Court erred in affirming the trial court's order suppressing the test results. In particular, we address whether the Commonwealth Court's reliance on our decision in *Deans* is tenable in light of the United States Supreme Court's subsequent decision in *Fisher, supra.* We heard argument on April 16, 2008, and now reverse.

When the Commonwealth appeals a suppression order, we consider only the evidence from the defendant's witnesses together with the portion of the Commonwealth's evidence which is uncontroverted. *Commonwealth v. Nester,* 551 Pa. 157, 161, 709 A.2d 879, 880–81 (1998). Our standard of

review is limited to determining whether the suppression court's factual findings are supported by the record, but we exercise *de novo* review over the suppression court's conclusions of law. *Id.*

On appeal, the parties reiterate the arguments offered below. The Commonwealth argues that under *Fisher* and *Trombetta* the lower courts erred in granting suppression because the soil samples were not destroyed in bad faith. By contrast, Appellees argue *Deans* requires suppression because the prosecution seeks to use the samples at trial, and the evidence is central to the prosecution's case. They further reiterate their argument that the TCLP test is unreliable.[3] *See* Briefs for Appellees at 13–17.[4] Appellees also suggest we reject *Fisher's* inquiry, which focuses on whether the prosecution acted in bad faith.

 The instant case implicates "what might loosely be called the area of constitutionally guaranteed access to evidence." *Arizona v. Youngblood,* 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (quoting *U.S. v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). The Due Process Clause of the Fourteenth Amendment requires defendants be provided certain access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense." *Trombetta,* 467 U.S. at 485, 104 S.Ct. 2528.[5] The guarantee of

3. Specifically, Appellees note that Commonwealth witness Paul Lyter testified the TCLP "wouldn't necessarily get a reliable result" a year after testing, N.T. Hearing, 9/29/04, at 24, and that according to defense witness Dr. James S. Smith, TCLP test results can vary by as much as 100 percent. N.T. Hearing, 9/24/04, at 72.

4. Two different briefs have been submitted for Appellees, one on behalf of Group Two, Snyder, and Smith, and one on behalf of Gerber. However, the briefs are nearly identical. Accordingly, we refer to them as "Briefs for Appellees," rather than citing to both, where the same language appears in both filings.

5. That amendment reads, in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law.

access to evidence underlies the requirements that the prosecution turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and turn over exculpatory evidence which might raise a reasonable doubt as to guilt even if the defense fails to request it, *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).[6] In *Trombetta* and *Youngblood,* the high Court first addressed the effect of the same principles on cases like the instant one, where evidence which is not materially exculpatory, but potentially useful, is destroyed before the defense has an opportunity to examine it.

In *Trombetta,* the high Court considered a case where the defendants were pulled over on California highways and subjected to breathalyzer tests, the results of which were introduced into evidence although the breath samples themselves had not been preserved by authorities. As a result of the samples' destruction, the defendants had not been able to subject them to additional independent tests and introduce the results into evidence.

The Court concluded the state did not violate due process in destroying the samples, noting there was no evidence the police acted in bad faith in destroying them. 467 U.S. at 488, 104 S.Ct. 2528. Moreover, and "[m]ore importantly," the Court concluded that a state's duty to preserve evidence is triggered only where the evidence has clear exculpatory value, and it is of such a nature that the defendant could not obtain "comparable evidence" by reasonably available means. 467 U.S. at 488–89, 104 S.Ct. 2528. Writing for the Court, Justice Marshall noted the breath samples came into the authorities' possession "for the limited purpose of providing raw data to the Intoxilyzer. The evidence to be presented at trial was not the breath itself but rather the Intoxilyzer results." 467 U.S.

U.S. Const., Amend. XIV, § 1. Again, we note that on this appeal, as below, Appellees assert only a violation of the federal Constitution, not the Pennsylvania Constitution. Briefs for Appellees at 4.

**6.** If a defendant asserts a *Brady* or *Agurs* violation, he is not required to show bad faith to justify suppression.

at 487–88, 104 S.Ct. 2528 (footnote omitted). He further noted the officials who destroyed the samples were acting "in good faith and in accord with their normal practice." *Id.* at 487, 104 S.Ct. 2528 (quoting *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961)).

Finally, Justice Marshall concluded the policy itself was "without constitutional defect": he noted the test results had no apparent exculpatory value, since they demonstrated the defendants were intoxicated. *Id.* at 489, 104 S.Ct. 2528. He further concluded that though the Intoxilyzers were highly reliable, the defendants could have "impeach[ed] the machine's reliability," "cross-examine[d] the law enforcement officer who administered the Intoxilyzer test," asserted "radio waves" or "chemicals that appear in the blood of those who are dieting" interfered with test results, or "attempt[ed] to raise doubts in the mind of the factfinder whether the test was properly administered." As a result, he determined, adequate comparable evidence was available to them. *Id.* at 490, 104 S.Ct. 2528.

Next, in *Youngblood,* the Court considered a situation where the defendant was arrested and convicted of child molestation, sexual assault, and kidnapping in connection with a little boy who had been abducted at a church carnival, driven to a secluded area near a ravine, molested, taken to a secluded house, sodomized repeatedly, and then returned to the carnival and threatened with death if he told anyone. The state of Arizona failed to preserve the semen samples taken from the victim's body and clothing, and so on federal grounds the Arizona Court of Appeals reasoned the defendant's conviction should be reversed. *State v. Youngblood,* 153 Ariz. 50, 734 P.2d 592 (Ariz.App.1986).

After comprehensively summarizing its jurisprudence on the subject, the Court held that absent a showing of bad faith on the part of law enforcement, the state's failure to preserve evidence which was "merely potentially useful" to a defendant—because any benefit to him was purely hypothetical— did not violate due process. In support of its determination, the late Chief Justice Rehnquist wrote:

[T]he Due Process Clause [does not require suppression] when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant ... We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

488 U.S. at 57, 109 S.Ct. 333.[7] The Court also concluded, though the evidence in question was more likely to be useful to Youngblood than had been the evidence in *Trombetta*, such distinction was not dispositive because "the State did not attempt to make any use of the materials in question." *Id.* at 56, 109 S.Ct. 333. *Youngblood* did not reiterate or apply *Trombetta's* analysis of comparable evidence, instead focusing solely on the bad faith of the state actors. *Id.* at 58, 109 S.Ct. 333 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").[8]

We applied *Trombetta* and *Youngblood* in *Deans*. There, we held suppression was required where the Commonwealth sought to introduce expert testimony that a lottery ticket was forged and the ticket was lost after the prosecution expert examined it, but before the defense could conduct an independent examination.[9] *See* 530 Pa. at 521, 610 A.2d at 35–36. We looked to two factors in so holding. Initially, we noted the missing evidence was "the primary evidence in the case." *Id.* at 518, 610 A.2d at 34. We concluded this distinguished the

7. As Appellees point out, Youngblood was subsequently exonerated after further DNA testing. Briefs for Appellees at 6.

8. *See infra* note 12.

9. As in the instant case, *see supra* note 5, in *Deans*, we addressed the appellant's due process rights solely under the federal constitution.

case from *Youngblood,* since there the missing evidence had been, in our judgment, merely supplementary. Next, we noted that in *Youngblood,* "[b]oth prosecution and defense were denied the use of 'evidence' which was unavailable because no tests were conducted on samples until the passage of time made such testing futile," whereas in *Deans,* "the prosecutor conducted an examination and is attempting to introduce the results of his examination as evidence against the defendant while denying to the defendant any possible benefit to be derived from an examination of the primary evidence in the case." *Id.* at 518–519, 610 A.2d at 34. Finally, although we did not explicitly cast unreliability as an independent basis for suppression, we noted that where confidence in a test result rises "almost to a certainty," the loss of evidence does not require suppression. We concluded:

> Loss of evidence need not preclude expert reports or testimony in every case. Results of tests conducted on different types of evidence will produce differing degrees of probability, sometimes amounting almost to a certainty. Chemical analyses of blood, breath, and narcotic substances produce consistent, highly reliable results. By contrast, psychiatric examination ... may produce opinions which are much more subjective and conclusions which are much more likely to be inconsistent or contradictory. The issue of the authenticity of the lottery ticket in this case appears to be at least somewhat subjective.

*Id.* at 520–21, 610 A.2d at 35.

Following our decision in *Deans,* in 2004, the high Court further clarified *Trombetta* and *Youngblood* in *Fisher.* There, the Court held due process did not require dismissal of charges where the police destroyed evidence of tests performed on cocaine during the ten years the defendant was a fugitive: even though the test results were submitted into evidence and constituted a central component of the prosecution's case, the evidence was only potentially useful to the defendant and it had not been destroyed in bad faith. The Court reaffirmed that the critical distinction for purposes of the Constitutional right to preservation of evidence was be-

tween "potentially useful evidence"—evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333—and "materially exculpatory evidence." The Court explicitly rejected the argument that *"Youngblood* does not apply whenever the contested evidence provides a defendant's 'only hope for exoneration' and is 'essential to and determinative of the outcome of the case,' " 540 U.S. at 548, 124 S.Ct. 1200, holding instead "the applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." *Id.* at 549, 124 S.Ct. 1200.[10]

In holding that even where destroyed evidence is central to the prosecution's case, a defendant must show bad faith to justify suppression, the high Court vitiated the first aspect of our holding in *Deans,* which considered such centrality in determining whether the evidence was admissible. Although the Court did not directly address the second aspect of our holding, distinguishing between evidence introduced at trial and evidence not introduced at trial, we conclude such a distinction must likewise fail.[11]

■ Whether the prosecution uses the evidence at trial is, like the distinction between central and supplementary evidence, a distinction rooted in the importance of a particular piece of evidence to the prosecution's case, rather than the

**10.** As in *Youngblood,* the *Fisher* Court did not reiterate or apply *Trombetta's* analysis of comparable evidence. *See infra* note 12.

**11.** We also emphasized the distinction between evidence introduced at trial and evidence not introduced at trial in refusing suppression in *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666 (1999). However, the only published opinion wherein a Pennsylvania court has considered both *Deans* and *Fisher* is *Commonwealth v. Free,* 902 A.2d 565 (Pa.Super.2006). Writing for a unanimous panel of the Superior Court, now-Justice McCaffery concluded that *Deans* did not apply to chemical analyses of marijuana plants, since those analyses were not "subjective" like the expert examination of the forged ticket in *Deans* and did not "result[ ]" in the appellant's complete inability to mount a defense." *Id.* at 574.

exculpatory value of the evidence. . Reliance on such a distinction is untenable in light of *Fisher's* holding that bad faith is required for a due process violation where merely potentially useful evidence is destroyed, no matter how useful to the prosecution. *See Fisher,* 540 U.S. at 549, 124 S.Ct. 1200. Moreover, as the Commonwealth points out, Brief for the Commonwealth at 14–15, the prosecution in *Fisher* also made use of the evidence in question and the high Court nonetheless held there was no due process violation absent a showing of bad faith. Accordingly, we conclude *Deans'* distinction between evidence introduced at trial and evidence not introduced at trial is also infirm in light of *Fisher.*

Appellees argue we should not be guided by *Fisher* in interpreting this right, but instead, follow the Texas Court of Appeals in holding a criminal defendant has an absolute right to an independent chemical analysis of a challenged substance regardless of bad faith. Briefs for Appellees at 10 (citing *Pena v. State,* 166 S.W.3d 274 (Tex.App.2005)). In that case, Texas' intermediate appellate court adopted the test laid out by the Supreme Court of Delaware in *Deberry v. State,* 457 A.2d 744 (Del.1983), which requires a court to consider (1) whether the evidence in question would have been subject to disclosure either under *Brady* or under the Delaware rules of criminal procedure, if it had still been in existence; (2) whether the state had a duty to preserve the material; and (3) what consequences should flow from a breach of that duty, considering the degree of bad faith or negligence involved, the importance of the evidence in question, and—if the issue arises after trial—whether the other evidence introduced at trial was sufficient to support the conviction.

We first note the *Pena* decision is not binding on us and, indeed, has since been vacated. 191 S.W.3d 133 (Tex.Crim. App.2006). On remand, the intermediate appellate court determined a cautionary instruction—not suppression—was the appropriate remedy. *Pena v. State,* 226 S.W.3d 634 (Tex.App. 2007). Further, the *Pena* decisions applied the Texas Constitution, not the federal due process clause instantly at issue. *See* 166 S.W.3d at 281. In fact, there is division within the

Texas Court of Appeals about the issue even under the Texas Constitution. *See State v. Vasquez*, 230 S.W.3d 744 (Tex.App. 2007) (rejecting *Pena* and applying the bad faith standard from *Fisher*). Since Appellees herein rely only on the federal Constitution and *Pena* did not interpret the federal Constitution, we find *Pena* unpersuasive, especially as compared to a clear statement of law from the United States Supreme Court.

Appellees' reliance on *Commonwealth v. Arenella*, 306 Pa.Super. 119, 452 A.2d 243 (Pa.Super.1982), in which the Superior Court held a defendant was entitled to an independent chemical examination of contraband alleged to be marijuana, is similarly misplaced. *Arenella* predated *Trombetta, Youngblood, Deans*, and *Fisher*, and is clearly no longer controlling authority on this issue. Moreover, the Superior Court has since held failing to preserve breath samples does not constitute a due process violation in the absence of bad faith. *Commonwealth v. Gamber*, 352 Pa.Super. 36, 42–43, 506 A.2d 1324, 1328 (1986).

 Finally, we reject the interpretation, urged by Appellees and the courts below, that *Deans* requires the results of tests performed on destroyed evidence to be suppressed if the test is not exceedingly reliable (Appellees argue, and the lower courts agreed, that the TCLP is unreliable). *See* Briefs for Appellees at 13–17, Cmwlth Ct. Op., 6/27/06, at 6. As discussed above, in *Deans*, we held "Loss of evidence need not preclude expert reports or testimony in every case. Results of tests conducted on different types of evidence will produce differing degrees of probability, sometimes amounting almost to a certainty." 530 Pa. at 620–21, 610 A.2d at 931. However, *Deans* did not characterize unreliability as an independent basis for the suppression of such test results; we merely held that where results *were* reliable it might render suppression unnecessary regardless of other factors, not that where results were unreliable, it might render suppression necessary even if other indicia were lacking. Moreover, *Trombetta* construed challenges to testing reliability as factual issues for the jury rather than issues to be determined by a court as a matter of law, and we see no reason to depart from that path. *See* 467

672

U.S. at 489–90, 104 S.Ct. 2528 (describing challenges to the reliability of the test as "comparable evidence" to be offered in rebuttal, not a justification for suppression); *see also Trevino v. Dahm*, 2 F.3d 829, 832 (8th Cir.1993) (holding "[a]s long as the defendant has an adequate opportunity to impeach the reliability of a scientific test, and the qualifications of the person administering the test, due process is not implicated by a state's good faith failure to preserve a sample for independent testing").

Having concluded *Fisher* is the governing standard, we now address Appellees' allegations that their federal due process rights were violated. First, we must determine whether the original samples were "materially exculpatory" or "potentially useful." We recognize this is a "treacherous task," requiring a court to "divin[e] the import of materials whose contents are unknown and, very often, disputed." *Trombetta*, 467 U.S. at 486, 104 S.Ct. 2528 (citation omitted). Accordingly, we have required support for an allegation that destroyed evidence was exculpatory, holding it cannot be based on a "mere assertion." *Commonwealth v. Small*, 559 Pa. 423, 441–42, 741 A.2d 666, 676 (1999); *see also U.S. v. Martinez*, 744 F.2d 76, 79–80 (10th Cir.1984) (rejecting a claim of a due process violation where the defendant's assertion that the lost evidence was exculpatory was "based purely on speculation and conjecture").

Here, common sense as well as the trial court's findings of fact make clear we are faced with "potentially useful," rather than "materially exculpatory," evidence. *Compare Youngblood*, 488 U.S. at 57, 109 S.Ct. 333 (evidence is potentially useful if "no more could be said than that it *could* have been subjected to tests, the results of which *might* have exonerated the defendant" (emphasis added)); *with* Trial Ct. Op., 4/21/05, at 5, ¶ 12 ("The soil samples discarded by the DEP were potentially exculpatory; if the defense had had an opportunity to conduct an independent analysis of the samples, they may have obtained different results which would have exonerated the defendants"); *see also* N.T. Hearing, 9/29/04, at 17 (trial court describing the evidence as "potentially exculpatory").

The samples had already been tested and had shown concentrations of toxins which were significantly above the statutory limits. Appellees may only hypothesize, in response, that further testing would have produced different results. This is a textbook case of potentially useful evidence. Accordingly, under *Fisher*, the test results may not be suppressed unless the Commonwealth acted in bad faith in destroying the soil samples.

The trial court found the Commonwealth did not act in bad faith, *see* N.T. Hearing, 9/29/04, at 60, N.T. Hearing, 3/28/05, at 106, and we are bound by that finding if supported by the record. Appellees argue the policy under which the samples were destroyed was informal and not required by EPA regulations, and both parties' expert witnesses, in other cases, had tested samples preserved more than six months. Briefs for Appellees at 12–14. Neither argument is adequate to demonstrate bad faith. While it is very unlikely we could find bad faith where samples are destroyed pursuant to standard procedure, *see U.S. v. Beckstead*, 500 F.3d 1154, 1159–60 (10th Cir.2007) (collecting cases), evidence destroyed outside a standard procedure is not *ipso facto* destroyed in bad faith. In this case, DEP appears to have disposed of the evidence pursuant to a procedure for disposing of hazardous waste which was—even if not rigorously formalized or mandated by EPA—at least somewhat regularized. Since Appellees' assertions demonstrate, at most, the disposal was unnecessary, they provide no grounds for affirming the trial court's finding. Accordingly, since the destroyed evidence was merely potentially useful, and the record supports the trial court's finding that it was not destroyed in bad faith, suppression is not warranted under *Fisher*. On this basis, we must reverse the Commonwealth Court's order affirming the trial court's suppression order, and remand for further proceedings.[12]

Order reversed and jurisdiction relinquished.

**12.** It is unclear post-*Fisher* (and perhaps even post-*Youngblood*) what remains of *Trombetta's* consideration of the existence of "comparable evidence" in the due process calculus. That is, once it is determined that evidence is merely potentially useful, it appears the claim of a due

Chief Justice CASTILLE and Justice SAYLOR, EAKIN and McCAFFERY join the opinion.

Justice BAER files a concurring opinion.

process violation may rise and fall solely depending on the existence of bad faith on the part of the state in destroying the evidence. Nevertheless, federal courts still rely to varying degrees on the availability of comparable evidence, *see, e.g., U.S. v. Haywood,* 363 F.3d 200 (3d Cir.2004), *U.S. v. Revolorio–Ramo,* 468 F.3d 771, 774 (11th Cir.2006), and the trial court in the instant case based its suppression order in part on its conclusion that such comparable evidence was not available. *See* Trial Ct. Op., 4/21/05, at 6. Regardless of the ongoing viability of this aspect of *Trombetta,* it is clear that Appellees had access to "comparable evidence." In *Trombetta,* the high Court classified as comparable evidence (1) challenges to the reliability of the test; (2) cross-examination of test administrators; (3) assertions that particular characteristics (for example, in the breathalyzer context, the suspect's diet) were present which were likely to undermine the accuracy of the results; and (4) the possibility of human error. 467 U.S. at 490, 104 S.Ct. 2528. All those strategies were available to Appellees in the instant case. Additionally, preliminary hearing testimony reveals Appellees contracted with Elk Environmental to remediate the property, and Elk contracted with GLA Laboratories to perform independent tests on soil samples from the property, taken in October of 2002, which also showed unlawfully high concentrations of lead. N.T. Hearing, 3/28/05, at 55–56. While these additional tests could not be used to prove Appellees' guilt, since the criminal complaint references only environmental violations committed between June 2001 and August 2002, had Appellees' independent tests revealed levels of toxins in the soil which were within the statutory limits just a short time after the Commonwealth's tests revealed the opposite, it would certainly have buttressed Appellees' argument that the tests do not provide consistent results sufficient to prove Appellees' guilt beyond a reasonable doubt, and provided Appellees with a reasonable opportunity to contest the Commonwealth's evidence. Under *Trombetta,* nothing more is required. *See Trombetta, supra* (noting the defendants had "alternative means of demonstrating their innocence"); *Elmore v. Foltz,* 768 F.2d 773, 778 (6th Cir.1985) (under *Trombetta,* what "matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence"); *Haywood, supra* (holding that where a photograph of a defendant wearing a particular shirt exists, the destruction of the shirt does not violate due process); *Revolorio–Ramo, supra* (holding the opportunity to cross-examine law enforcement officers who had viewed the contents of a boat, the defendants' own testimony, and documented evidence of commercially available fishing equipment constituted comparable evidence where the actual boat was destroyed).

Justice BAER, concurs.

I join in the Majority's decision because this Court is bound to defer to the United States Supreme Court's interpretation of federal due process precepts as enunciated in *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004). I believe, however, that our interpretation of due process and fundamental fairness in *Commonwealth v. Deans,* 530 Pa. 514, 610 A.2d 32 (1992), was correct, and would be inclined to consider our analysis in *Deans* in the context of a due process argument premised upon the Pennsylvania constitution when such an argument is properly presented.

Pursuant to a search warrant, the Commonwealth removed soil samples from Appellees' property and determined that the soil contained levels of lead and silver that exceeded the limits established by the Solid Waste Management Act, 35 P.S. §§ 6018.101 *et seq.* (the Act). After the Commonwealth brought charges against Appellees for violations of the Act, they moved to suppress the test results because the samples had been destroyed before they were able to test them. Appellants argued that the destruction of the soil samples violated their federal due process rights, as interpreted and applied by this Court in *Deans.* The trial court suppressed the soil sample test results, and the Commonwealth Court affirmed. The Majority now reverses, finding that our analysis in *Deans* was overruled by the U.S. Supreme Court in *Fisher.*

In *Deans,* we examined whether a defendant's due process rights under the federal constitution required the exclusion of the Commonwealth's expert opinion regarding tests performed on a lottery ticket allegedly forged by the defendant which was lost before the defense could examine it. The Commonwealth alleged that their expert report was central to the prosecution. We held that because the Commonwealth was attempting to use the evidence against the defendant, and in fact, could not make a case without it, while denying to the defendant any possible benefit to be derived from an examination of the evidence, the defendant's federal due process rights were violated. *Id.* at 34. We rejected the Commonwealth's

argument that when the state fails to preserve potentially useful evidence, the due process clause of the federal constitution is not violated unless there is evidence of the Commonwealth's bad faith. *Id.* The Court reasoned that to permit the prosecution to use the evidence would deprive the defendant of federal due process irrespective of the good or bad faith on the part of the prosecution. *Id.*[1]

Following our decision in *Deans*, in 2004 the Supreme Court decided *Fisher, supra.* In *Fisher*, the Court did not focus on the centrality of the missing evidence to the Commonwealth's case, as this Court did in *Deans*. Rather, the Supreme Court found that whether a federal due process violation occurs depends on whether the evidence can be considered materially exculpatory or merely potentially useful to a defendant. When the state fails to disclose evidence that is materially exculpatory to a defendant, a federal due process violation occurs and the evidence must be suppressed without regard to the good or bad faith of the prosecution. *Fisher*, 540 U.S. at 547, 124 S.Ct. 1200 (*citing Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (characterizing as materially exculpatory the extra-judicial statements made by the defendant's confederate, in which the confederate confessed to the murder for which the defendant was prosecuted)). In contrast, the federal due process clause requires a different result when the state fails to preserve "evidentiary material of which not more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). The High Court characterized such evidence as only "potentially useful" to a defendant, and concluded that the failure to preserve such evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Fisher*, 540 U.S. at

---

1. We noted that lost evidence does not preclude expert reports or testimony in every case, because results of tests conducted on different types of evidence will produce differing degrees of probability, sometimes amounting to a near certainty, other times being more subjective. *Deans*, 610 A.2d at 35. An opinion about the authenticity of a lottery ticket was at least somewhat subjective, and, as such, more likely to produce inconsistent or contradictory opinions. *Id.*

547–48, 124 S.Ct. 1200 (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333).

The evidence in *Fisher* was a white powdery substance revealed to be cocaine by four laboratory tests. The defendant sought a fifth test, which could not be conducted because the state had disposed of the evidence in accord with its policy. Because the most the defendant could hope for was that a fifth test conducted on the substance would have been inconsistent with the first four tests, the U.S. Supreme Court found that the evidence was potentially useful, not materially exculpatory, and that the defendant had to prove bad faith on the part of the state before establishing a federal due process violation. As the Majority in the instant case notes, the *Fisher* Court explicitly rejected an examination of the centrality of the evidence (the dominant concern of our Court in *Deans* ), holding that "the applicability of the bad-faith requirement of *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." *Fisher,* 540 U.S. at 549, 124 S.Ct. 1200.

Because *Deans* considered the centrality of the evidence to the prosecution's case, and *Fisher* held that even where the destroyed evidence is central to the prosecution's case, a defendant must show bad faith to justify suppression, the Majority correctly notes that the High Court vitiated that aspect of our holding in *Deans.* Both *Deans* and *Fisher* implicated the federal constitution's guarantee of due process; where our interpretation of the federal constitution differs from that of the Supreme Court, we must defer to the High Court as the final arbiter of the federal constitution. Therefore, I am constrained to agree with the Majority's application of *Fisher,* overruling *Deans,* in this case.

I write separately to express my opinion that the *Deans* construct analyzing the centrality of the evidence to the Commonwealth's case remains, to me, a preferable criteria to employ in determining whether there is a due process violation. Nonetheless, as a matter of federal due process, *Fisher*

vitiated that test in favor of the "materially exculpatory"/"potentially useful" analysis, and Appellees limited their argument to the federal constitution, not raising a parallel argument premised on the Pennsylvania constitution.

The provisions of the Pennsylvania constitution may provide greater protection than their federal counterparts. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). We may construe Article I, Section 9 of the Pennsylvania Constitution more broadly than federal due process where there are particular reasons to do so. *Commonwealth v. Kratsas,* 564 Pa. 36, 764 A.2d 20 (2001) (rejecting the defendant's invitation to construe the Pennsylvania constitution more broadly than federal due process because the defendant failed to offer any particular reasons to support the departure); *Commonwealth v. Mance,* 539 Pa. 282, 652 A.2d 299, 302 (1995) (same). Therefore, provided a defendant sets forth an independent analysis of the Pennsylvania constitution pursuant to *Edmunds,* I look forward to examining whether Pennsylvania should go beyond the minimum protection established by *Fisher* and, specifically, whether those aspects of the *Deans* centrality of the evidence analysis that the Majority concludes are abrogated as a matter of federal constitutional law following *Fisher,* exist as a matter of Pennsylvania constitutional law.