# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nancy J. Gardner,                             :
              Petitioner        :
                               :
         v.                                   :   No. 2339 C.D. 2015
                               :   Submitted: July 8, 2016
State Civil Service Commission                :
(Pennsylvania Department of                   :
Transportation),                              :
              Respondent      :

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**               **FILED: October 6, 2016**

          Nancy J. Gardner (Gardner) petitions for review of an order of the State Civil Service Commission (Commission) sustaining the removal imposed by her employer, the Pennsylvania Department of Transportation (Appointing Authority). The Commission determined the Appointing Authority established just cause under Section 807 of the Civil Service Act (Act),[1] and that her removal was not discriminatory under Section 905.1 of the Act.[2] Gardner asserts sending inappropriate texts to a subordinate with whom she had a personal relationship was not just cause. She claims that, as the victim of sexual harassment, her removal was discriminatory. She also contends the Commission erred in not applying an adverse inference to the Appointing Authority's evidence. Discerning no error below, we affirm.

---

[1] Act of August 5, 1941, P.L. 752, as amended, 71 P.S. §741.807.

[2] Added by the Act of August 27, 1963, P.L. 1257, as amended, 71 P.S. §741.905a.

## I. Background

Gardner worked for the Appointing Authority as Assistant Highway Maintenance Manager, probationary status, until her removal on October 31, 2014. During her approximately 15-year tenure, she was promoted through the ranks as a regular status employee, holding a management position since 2005. As manager, her duties included overseeing highway maintenance foremen and enforcing the Appointing Authority's policies. These policies included the Sexual Harassment Policy, and Harassment/Hostile Work Environment Policy (collectively, Policies).

While employed, Gardner engaged in a sexual relationship with Keith Lambert (Lambert) one of the foremen who reported to a manager she supervised. Gardner served as Lambert's direct supervisor when his supervisor was not working. Comm'n Adj., 10/30/15, Finding of Fact (F.F.) No. 11. Lambert ended the relationship around the holidays at the end of 2014. Months later, Gardner began texting Lambert after work hours.

Lambert began saving the texts when Gardner texted the following in July 2014: "You are a jerk. Got everything you wanted- conquered me. Happy with yourself? <u>Life at work will suck for you</u>." F.F. No. 18 (emphasis added); Comm'n Hr'g, Notes of Testimony (N.T.), 3/27/15, at 27. Gardner sent additional texts between July and September 2014, including the following:

- Contacting Joeanne [Lambert's girlfriend]. You screwed the wrong person. Literally.

- You will be sorry.

- You're just like every other man I ever met, a self-centered [*ss]-hole … Go to the union.

- You will have a miserable life.  Karma is a b*tch.

F.F. Nos. 19-21, 23.  In addition, Gardner suggested Lambert find another job as she had no intention of leaving, "[s]o I'm sorry but you and I will have to deal with seeing each other occasionally."  F.F. No. 26.  Lambert did not respond.

Gardner also sent Lambert text messages pertaining to the job in late July.  As part of that exchange, she texted, "Thank you for responding.  It is money – will help you support your girlfriend and her son.  Lol!  All you guys are jerks."  F.F. No. 34.  Within the hour, she texted "Don't EVER speak to me again.  A[**]hole."  F.F. No. 35.  She continued texting Lambert through October 2014, and then left a voicemail message for him.[3]

Shortly thereafter, Lambert reported the text messages to Labor Relations Coordinator Joseph Rhodomoyer (Rhodomoyer), who investigated the matter.  Rhodomoyer secured the texts from Lambert.  Initially, Lambert wrote a statement characterizing his relationship with Gardner as a "one-night stand."  F.F. No. 42.  However, the following day, he retracted that statement and rewrote it to reflect the duration of their relationship as approximately three months.  F.F. No. 43.

Gardner attended a pre-disciplinary conference (PDC) where Rhodomoyer reviewed Lambert's statement and the text messages.  Gardner admitted she sent the text messages and she acknowledged her conduct was inappropriate.  F.F. No. 48. The PDC panel recommended Gardner's removal.

---

[3] Although the voicemail message was played during the hearing, it was not transcribed.

Ultimately, Chief of Labor Relations Dale Wetzel (Wetzel) and human resources personnel reviewed the recommendation, the text messages and other information, and agreed with the recommendation of removal. In November 2014, the Appointing Authority charged Gardner as follows:

> The reason for your removal is (1) inappropriate behavior[;] (2) violation of [Appointing Authority's] Harassment Policy[;] and[,] (3) Violation of [the] Sexual Harassment Policy. Specifically, on numerous occasions beginning in July 2014, you sent inappropriate text messages that were harassing, sexual in nature, and threatening to the terms and conditions of employment for a rank and file employee.

Supplemental R.R. (S.R.R.) at 48b.

Relevant here, the Sexual Harassment Policy provides: "No manager, supervisor or other employee shall threaten or suggest, either explicitly or implicitly, that the refusal by another employee or applicant for employment to submit to sexual advances in any form will adversely affect that person's employment." Reproduced Record (R.R.) at 58a; S.R.R. at 35b. The Harassment Policy states: "Any Department employee involved in harassing or retaliating against an employee or covered third-party employee will be subject to discipline, up to and including dismissal." S.R.R. at 40b.

Gardner appealed to the Commission, which held a just cause hearing.[4] The Appointing Authority presented the testimony of Lambert, Rhodomoyer, and Wetzel. Gardner testified on her own behalf and recalled Wetzel.

---

[4] Gardner received a hearing under Section 804.1(a) of the Act, added by Act of September 29, 1951, P.L. 1636, as amended, 71 P.S. §741.804a(a), because she was on regular status before her promotion to a manager on probationary status, and she was not returned to regular status.

4

Lambert testified he and Gardner had an intimate relationship from October 2013 until December 2013, when he ended it and reconciled with his girlfriend. After their intimate relationship ended, starting in March 2014, Gardner sent text messages and placed calls to Lambert's cell phone. Lambert began saving the text messages in July 2014 because he believed his job was in jeopardy, and he felt threatened that Gardner would expose their relationship to his girlfriend. Lambert testified Gardner's text messages made him feel uncomfortable in the work place.

Rhodomoyer testified regarding his investigation and the PDC panel recommendation. He reviewed text messages on Lambert's phone, and printed the ones related to the allegations (Texts). He thought 24 pages of Texts corroborating Lambert's statement were sufficient. He confirmed that the Appointing Authority only used the Texts that he printed in its investigation. He recommended Gardner's discharge based on her violation of the Policies. Specifically, Gardner violated the Policies by "creating an intimidating, hostile or offensive work environment -- which we believe that [Lambert's] statements and the [Texts] would fall in that category." N.T. at 106. He held Gardner to a higher standard as a manager.

Wetzel testified as to his role in Gardner's removal and Appointing Authority's handling of sexual harassment cases. He testified that Gardner's managerial position of authority over Lambert was "the biggest factor" supporting removal. N.T. at 160. As to other harassment cases, he explained almost all cases involving a manager's violation of the Policies resulted in discharge. However, he acknowledged one case in which the Appointing Authority offered a male supervisor accused of sexual harassment by a female subordinate a demotion.

5

Gardner testified regarding her personal relationship with Lambert. She claimed she did not intend to make Lambert's work life miserable. She explained people at work were upset about the relationship, and the rumors made her uncomfortable. She disagreed calling Lambert an "[a\*\*hole]" was harassment. N.T. at 225. She did not think sending text messages to a subordinate employee during non-work hours related to her employment. N.T. at 225-30. During work hours, she testified, "I felt my behavior toward [Lambert] was fine." Id. at 236. However, she conceded her Texts "could be construed as harassing." N.T. at 237.

During the hearing, Gardner's counsel raised a spoliation objection to admission of the Texts. Counsel argued the Appointing Authority selectively preserved the Texts, suggesting other texts portrayed Gardner more favorably. Gardner did not save her text messages, and after contacting Verizon, she was unable to retrieve other texts. She was unable to confirm whether any text messages were missing. The Commission kept the record open after the hearing to allow Gardner to submit evidence regarding any additional text messages. She did not.

Ultimately, the Commission dismissed Gardner's appeal, sustaining the Appointing Authority's removal for just cause. The Commission credited Lambert's testimony that the Texts "made him uncomfortable and feel that his job was threatened." Comm'n Adj. at 19. The Commission determined the Texts were "inappropriate, demeaning and harassing [and] reflect[ed] negatively upon her competence and ability to perform her management job duties." Id. It rejected the personal relationship as a defense for the Texts. The Commission also determined Gardner did not present sufficient evidence of discrimination.

6

Gardner filed a petition for review. The Appointing Authority intervened and filed a brief.

## II. Discussion

On appeal,[5] Gardner challenges the Commission's adjudication on several grounds. She asserts Lambert created a hostile work environment by telling co-workers they engaged in a one-night stand when the relationship lasted several months. She claims Lambert's lie about the one-night stand provoked her to send the Texts. She denies the Texts, which were personal in nature, justified her removal. She also argues the Appointing Authority discriminated against her as a female supervisor when it discharged her but offered a demotion to a male supervisor accused of sexual harassment. In addition, Gardner contends the Appointing Authority suppressed text messages favorable to her. As a result, the Commission should have applied an adverse inference to the Texts.

### A. Just Cause

Section 807 of the Act provides, "[n]o regular employe in the classified service shall be removed except for just cause." 71 P.S. §741.807. "The appointing authority bears the burden of proving just cause and the substance of the charges underlying the employee's removal." Dep't of Transp. v. State Civil Serv. Comm'n, 84 A.3d 779, 783 (Pa. Cmwlth. 2014).

---

[5] Our scope of review considers whether the findings of fact are supported by competent evidence, whether errors of law were committed or whether constitutional rights were violated. Ellerbee-Pryer v. State Civil Serv. Comm'n, 803 A.2d 249 (Pa. Cmwlth. 2002). Our standard of review is deferential on factual findings and is de novo on matters of law. Pinto v. State Civil Serv. Comm'n, 912 A.2d 787 (Pa. 2006).

Although the Act does not define "just cause," our Supreme Court states that just cause "must be merit-related and the criteria must touch upon [the employee's] competency and ability in some rational and logical manner." Dep't of Corr. v. State Civil Serv. Comm'n (Clapper), 842 A.2d 526, 535 (Pa. Cmwlth. 2004) (quoting Galant v. Dep't of Envtl. Res., 626 A.2d 496, 498 (Pa. 1993)). "[T]o be sufficient … the cause should be personal to the employ[ee] and such as to render [her] unfit for the position [she] occupies, thus making [her] dismissal justifiable and for the good of the service." Woods v. State Civil Serv. Comm'n, 912 A.2d 803, 808 (Pa. 2006). Whether a civil service employee's conduct constitutes just cause for removal is a question of law. Pa. Bd. of Prob. & Parole v. State Civil Serv. Comm'n (Manson), 4 A.3d 1106 (Pa. Cmwlth. 2010).

Here, Gardner's conduct of sending the Texts to Lambert, a subordinate in her direct chain of command, constitutes just cause for her removal. Gardner was a managerial employee, and at times, Lambert's direct supervisor. N.T. at 85, 113, 152. Although Gardner did not take any adverse employment action against Lambert, she was in a position where she could do so. She sent numerous text messages to Lambert after he ended their intimate relationship. The Texts were sexual in nature, insulting and threatened Lambert's employment. She threatened: "Life at work will suck for you[,]" and "You will be sorry." F.F. Nos. 18, 20; Certified Record (C.R.) Item No. 1 (Hr'g Transcript, Ex. AA3). The nature and multitude of the Texts created a hostile work environment for Lambert.

In addition, one of Gardner's managerial duties was enforcing Appointing Authority's Sexual Harassment Policy and Harassment/Hostile Work

8

Environment Policy. She acknowledged her conduct could be construed as harassment, and the Commission determined she violated the Policies. Creating a hostile work environment compromised her ability to perform her job. In one instance, in a work-related exchange, Gardner called Lambert an "[a**]hole" and a jerk. F.F. Nos. 34-35. Sending the Texts also called into question her competency to enforce the Policies. These reasons are ample cause for Gardner's removal.

Nevertheless, Gardner argues her Texts should be excused because they occurred in the context of a consensual intimate relationship. We disagree. First, at the time Gardner sent the Texts, she and Lambert were not in an intimate relationship. F.F. Nos. 14-15. Second, participating in an intimate relationship does not excuse a manager from engaging in harassing and insulting communications to a rank and file employee. Regardless of the consensual nature of the relationship, threatening a subordinate's work life and repeatedly referring to him in a pejorative fashion creates a hostile environment. A manager charged with enforcing the Policies should recognize that.[6]

Moreover, "the Commission is the sole fact-finder." Perry v. State Civil Serv. Comm'n (Dep't of Labor & Indus.), 38 A.3d 942, 948 (Pa. Cmwlth.

_____

[6] Gardner also characterizes the Texts as responses to provocation and sexual harassment, in which she is the victim. Pet'r's Br. at 13-16. However, from our review of the testimony, this charge is wholly unsupportable. Gardner did not testify that she sent the Texts in response to some provocation, and she did not identify herself as a victim of sexual harassment. Regarding the Texts, she either acknowledged them as inappropriate or failed to recognize them as hostile or threatening. For example, as to "karma is a b*tch," she said "I don't see how [he perceived that as a threat to his job]. Karma is karma. That doesn't have anything to do with his job." N.T. at 215. Further, there is no evidence that Lambert spoke about the relationship at the workplace. To the contrary, the record reflects Lambert attempted to keep the relationship hidden.

9

2011). As such, the Commission "has exclusive authority to assess witness credibility and resolve evidentiary conflicts." Pike Cnty. Child Welfare Serv. v. State Civil Serv. Comm'n 143 A.3d 1030, __ (Pa. Cmwlth. 2016), Slip Op. at 11, 2016 WL 3755777, at *5. This Court "will not reweigh the evidence" or substitute our judgment even though we might have reached a different factual conclusion. Id. Further, we review the Commission's decision in the light most favorable to the prevailing party.

The Commission credited the testimony of Lambert and Rhodomoyer. Comm'n Adj. at 19. The Commission squarely rejected Gardner's justification defense (that the Texts were outside the employment relationship because she sent most of them after work hours). Id. at 18-19. Accordingly, we agree with the Commission's determination that the Appointing Authority had just cause for Gardner's removal.

### B. Discrimination

Next, Gardner asserts the Appointing Authority discriminated against her based on her gender. Specifically, she claims another manager who violated the Sexual Harassment Policy, a male otherwise similarly situated, was given the option of a demotion, not removal as in her case.

Section 905.1 of the Act prohibits discrimination as follows:

> No officer or employe of the Commonwealth shall discriminate against any person in the recruitment, examination, appointment, training, promotion, retention, or any other personnel action with respect to the classified service because of political or religious opinions or affiliations

10

because of labor union affiliations or because of race, national origin or other non-merit factors.

71 P.S. §741.905a. "Traditional discrimination" claims focus upon such factors as race, sex, age, religion or labor union affiliation. Pronko v. Dep't of Revenue, 539 A.2d 456, 462 (Pa. Cmwlth. 1988).

In analyzing claims of traditional discrimination, this Court applies "a uniform, yet flexible, standard of proof, when possible." Henderson v. Office of the Budget, 560 A.2d 859, 862 (Pa. Cmwlth. 1989). The complaining party must prove a *prima facie* case by producing sufficient evidence that, if believed, indicates that more likely than not discrimination occurred. Dep't of Health v. Nwogwugwu, 594 A.2d 847 (Pa. Cmwlth. 1991). Once a *prima facie* case is established, the burden shifts to the appointing authority to present a legitimate, non-discriminatory basis for the employment action. Henderson. However, the complaining party always retains the burden of persuasion. Id.

The party alleging discrimination "is required to allege with specificity the basis underlying the claim of discrimination." Craig v. State Civil Serv. Comm'n (Dep't of Envtl. Prot.), 800 A.2d 364, 365 (Pa. Cmwlth. 2002). "Discrimination cannot be inferred; there must be affirmative factual support to sustain the allegations." Id. Further, the employee must prove she was treated differently than others similarly situated. Nwogwugwu.

Gardner bore the burden of producing sufficient evidence of discrimination. The only evidence she presented on this issue was Wetzel's testimony. He testified the Appointing Authority handled her case consistently with

11

other cases involving similar facts. N.T. at 162. He noted that another employee, when confronted with his violation of the Sexual Harassment Policy, was offered a demotion. Id. at 192. That employee was a male supervisor who held a similar position to Gardner *before* her promotion to Assistant Highway Maintenance Manager.

The Commission determined this was not sufficient evidence to support a discrimination claim. We agree. Gardner did not submit any evidence to show the similarity in her conduct as compared with the conduct of this male supervisor.[7] Further, because the level of managerial responsibility differed, the employee was not similarly situated to Gardner. Accordingly, Gardner did not establish discrimination. Regardless, the Appointing Authority established her removal was based on non-discriminatory reasons and supported by just cause.

## C. Preservation of Evidence

Lastly, we address Gardner's claims regarding missing text messages. She contends the Appointing Authority breached its duty to preserve evidence and "cherry-picked" text messages, excluding those that supported her claims. Pet'r's Br. at 8. She alleges this "suppression of evidence favorable to a party violates due process as provided by the U.S. Constitution." Id. at 19. She argues Lambert and

---

[7] Notwithstanding the lack of record evidence regarding the conduct of the male supervisor, in her brief, Gardner summarized this Court's description of that male supervisor's conduct from an unreported opinion to allow for a comparison to Gardner's conduct. Bauer v. Unemployment Comp. Bd. of Review (Pa. Cmwlth., No. 151 C.D. 2015, filed August 21, 2015) (unreported). This Court's opinion does not constitute evidence, and may not be considered for the first time on appeal. Moreover, this Court recently affirmed the Commission's order sustaining Appointing Authority's removal of that supervisor. See Bauer v. State Civil Serv. Comm'n (Pa. Cmwlth., No. 2652 C.D. 2015, filed September 23, 2016) (unreported).

12

Rhodomoyer's admissions that there may be other text messages sent between July and October 2014 entitled her to an adverse inference based on spoliation.

### 1. Spoliation

"'Spoliation of evidence' is the non-preservation or significant alteration of evidence for pending or future litigation." Pyeritz v. Com., 32 A.3d 687, 692 (Pa. 2011); King v. Pittsburgh Water & Sewer Auth., 139 A.3d 336, 345 (Pa. Cmwlth. 2016). "The doctrine of spoliation provides that a party may not benefit from its own destruction or withholding of evidence." King, 139 A.3d at 345.

"[T]he destruction or withholding of evidence which a party ought to produce gives rise to a presumption unfavorable to him, as his conduct may properly be attributed to his supposed knowledge that the truth would operate against him." Pyeritz, 32 A.3d at 692 n.5 (citation omitted). To compensate a party whose rights are impaired by the destruction of evidence, the party may be entitled to an adverse inference against the party responsible for the destruction. Duquesne Light Co. v. Woodland Hills Sch. Dist., 700 A.2d 1038 (Pa. Cmwlth. 1997).

In determining whether an adverse inference is warranted, we consider the degree of fault of the party who allegedly destroyed the evidence. King.[8] The degree of fault is comprised of two components: (1) the extent of the party's duty to preserve the evidence; and, (2) the presence or absence of bad faith.

---

[8] Other factors we consider when determining a spoliation of evidence penalty are the degree of prejudice suffered by the opposing party and the availability of a lesser sanction while protecting the opposing party's right. King v. Pittsburgh Water & Sewer Auth., 139 A.3d 336, 345 (Pa. Cmwlth. 2016).

Id. The duty to preserve evidence is established where both "the offending party knows litigation against it is pending or likely; and, it is foreseeable that discarding the evidence would be prejudicial." Id. at 348.

The rule permitting a fact-finder to draw an adverse inference from a party's failure to produce missing evidence "is inapplicable if such [evidence] is equally available to both sides of the litigation. In other words, the inference is permitted only where the [evidence] is peculiarly within the reach and knowledge of only one of the parties." Bentivoglio v. Ralston, 288 A.2d 745, 748 (Pa. 1972) (citations omitted) (emphasis added).

Here, the Appointing Authority had a duty to preserve evidence. There is no evidence of any breach of that duty so as to give rise to an adverse inference.

At the outset, it bears emphasis that while Gardner repeatedly asserts the Appointing Authority "edited" or selectively printed the Texts, neglecting to preserve more favorable text messages, no evidence supports this claim. To the contrary, the testimony of Rhodomoyer and Lambert is consistent: the Texts comprise all the text messages related to Lambert's harassment claim. N.T. at 48, 57, 92-93, 137-38; F.F. No. 15.

Rhodomoyer did not recall seeing more text messages pertaining to Gardner than those he printed. The Commission found Rhodomoyer secured the available text messages on Lambert's cell phone, and he did not edit them. F.F.

14

Nos. 44-45; N.T. at 92, 137. Although he did not print all of the text messages, he printed most of them, and printed all the text messages that related to the allegations. See N.T. at 92-93, 136-38. The Commission credited this testimony. Comm'n Adj. at 19.

To the extent Gardner sent other text messages, the texts as described by Lambert were not relevant to the allegations. N.T. at 57 ("I might have had texts, but they weren't threatening."). Moreover, Lambert repeatedly testified he saved all his text messages. N.T. at 48, 57. Therefore, additional text messages, if any, were discoverable.

Significantly, Gardner did not testify that other text messages existed. She also did not testify as to the contents of the alleged missing text messages. Indeed, she testified she did not know whether there were any other text messages that would have any bearing on this case. N.T. at 244-45. Therefore, Gardner presumes a precondition for her spoliation claim, that material evidence is missing.

Here, there is no evidence of exclusion of more favorable text messages. Moreover, the evidence was equally available to Gardner as she was a party to all the text messages. Also, she did not testify that additional text messages existed to cast the Texts in a positive light. Thus, she failed to show prejudice.

The Commission properly evaluated Gardner's spoliation claim based on: control of and access to the evidence; suppression or withholding of evidence; relevance of the evidence to claims or defenses; and, foreseeability that the

15

evidence would be discoverable in litigation. Based on the foregoing discussion, we discern no error in the Commission not applying an adverse inference here.

## 2. Due Process

Lastly, we address the alleged violation of Gardner's due process right to access evidence. Our Supreme Court analyzed "what might loosely be called the area of constitutionally guaranteed access to evidence" in Commonwealth v. Snyder, 963 A.2d 396, 401 (Pa. 2009). That case arose in the criminal context, involving the Department of Environmental Protection's destruction of soil samples used to prosecute statutory violations. There, our Supreme Court explained "[t]he guarantee of access to evidence underlies the requirements that the prosecution turn over, if requested, any evidence which is exculpatory and material to guilt or punishment." Snyder, 963 A.2d at 401. The constitutional guarantee arises when the state is asked to turn over evidence, and fails to do so, and the evidence is exculpatory and material to the charges. Further, when a party alleges that evidence is destroyed or missing, our courts "require support for an allegation that destroyed evidence was exculpatory, holding it cannot be based on a 'mere assertion.'" Id. at 405 (quoting Com. v. Small, 741 A.2d 666, 676 (Pa. 1999)).

Our courts hold "the constitutional guarantee of due process is equally as applicable to administrative proceedings as it is to judicial proceedings." McClelland v. State Civil Serv. Comm'n, 322 A.2d 133, 135 (Pa. Cmwlth. 1974); see also Fisler v. State Sys. of Higher Educ., California Univ. of Pa., 78 A.3d 30, 40 (Pa. Cmwlth. 2013). However, due process in administrative proceedings is a more flexible concept and the traditional rules of evidence do not apply. KC

Equities v. Dep't of Pub. Welfare, 95 A.3d 918, 933 (Pa. Cmwlth. 2014) (a refusal to answer discovery does not violate due process). Therefore, it is unclear that Gardner merits the access <u>Snyder</u> affords to criminal defendants.

In administrative proceedings, due process is served when a party is permitted to review any evidence an agency will introduce at hearing. <u>KC Equities</u>. Here, the Appointing Authority made the Texts available, and only used the Texts during the hearing. N.T. at 25 (Appointing Authority's counsel: "Everything that I'm going to present here today, you had received a copy of that on Tuesday."). That satisfied Gardner's due process right to evidence.

Moreover, even under <u>Snyder</u>, we discern no denial of due process here. Gardner did not establish that she asked the Appointing Authority or Lambert to turn over all the text messages she sent between July and October 2014. There is no evidence that any text messages other than the Texts pertain to the allegations against Gardner. In fact, Gardner could not recall whether she sent any other messages, and she did not know whether any other messages existed. Gardner offers no more than "mere assertions" as to the destruction of potentially helpful evidence. <u>Snyder</u>. Unsubstantiated assertions do not suffice. <u>Id.</u>

### III. Conclusion

For the foregoing reasons, we affirm the Commission's order and adjudication.

_____
ROBERT SIMPSON, Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nancy J. Gardner,                                   :
                            Petitioner               :
                                                     :
                v.                                   :     No. 2339 C.D. 2015
                                                     :
State Civil Service Commission                       :
(Pennsylvania Department of                          :
Transportation),                                     :
                            Respondent               :

## O R D E R

**AND NOW**, this 6th day of October, 2016, the order of the State Civil Service Commission is **AFFIRMED**.


_____
ROBERT SIMPSON, Judge