J-A21026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIUS LEONDUS WILCOX | : | |
| | : | |
| Appellant | : | No. 231 MDA 2025 |

Appeal from the PCRA Order Entered February 4, 2025
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s): CP-54-CR-0000355-2022

BEFORE: PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.: **FILED: OCTOBER 21, 2025**

Julius Leondus Wilcox ("Wilcox") appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA")[1]. We affirm.

Between March 2020 and September 2021,[2] while Wilcox was serving a sentence at State Correctional Institute Frackville ("SCI-Frackville"), he exposed himself on eight separate occasions to multiple members of prison staff, including four corrections officers ("COs"), four nurses, and a psychological services specialist. After each of these incidents, prison employees prepared and promptly served Wilcox with a misconduct report

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 42 Pa.C.S.A. §§ 9541-9546.

[2] We note that although the lower courts indicated that these events occurred between March 2020, and December 2021, and this Court previously indicated as such on direct appeal, our review of the record shows that the earliest of the underlying incidents occurred on March 7, 2020, and the last incident occurred on September 28, 2021. **See** N.T., 6/23/22, at 19, 86.

detailing his problematic behavior and notifying him of the prison's intent to take disciplinary action by referring the matter to a hearing officer who would conduct a misconduct hearing at which Wilcox could appear and contest the misconduct report.[3]

Notably, with respect to the incident occurring on February 28, 2021, Wilcox did not dispute that he committed the acts of which he was accused; instead, Wilcox argued that the prison could not discipline him for the incident because it had not timely provided him with a misconduct report. Following a review of the prison's surveillance footage, however, the hearing examiner ultimately determined that prison authorities had timely provided Wilcox with the misconduct report, and that the evidence otherwise supported a determination that he committed the underlying acts, reasoning as follows:

> [Wilcox] denies that he was given the misconduct [report]. [The m]isconduct [report] annotated that it was served [on February 28, 2021] at 22[:]17[. Wilcox] asked for video to be reviewed to prove he was not served by staff. . . . Wilcox agreed to continue the hearing until video can be viewed. On [March 11, 2021, the hearing examiner] viewed video provided [but i]t was determined that the video was for the wrong time frame. [Wilcox] was served the misconduct [report] at 22[:]17[,] and video was from t[i]me of the incident 20[:]15. Video for [February 28] at 21[:]13 shows officer at door of [Wilcox's] cell with paperwork.

---

[3] The record reflects that Department of Corrections ("DOC") policy required SCI-Frackville employees to draft a misconduct report for any incidents of misconduct before the end of their shift, and to then serve it upon Wilcox that same day. Once Wilcox received notice via this report, he would then be subject to a misconduct hearing during which he could argue his case before a hearing examiner. The hearing examiner would then ultimately determine Wilcox's level of guilt and impose corresponding punishment, if applicable.

He is at the door for about [fifteen] seconds. This is enough time for service of [the] misconduct [report].

Hearing resumed [March 16th] at 11[:]12 [hours]. [Wilcox] still denied that he was served [with the] misconduct [report]. Claims he cannot be held responsible for his actions as he was on a hunger strike. Does not remember the incident.

[The hearing examiner] finds [the misconduct] report is more credible than [Wilcox's] denial that he . . . engage[d] in indecent exposure by removing his penis and showing it to female staff. Preponderance of evidence exists to support the charge.

Disciplinary Hearing Report, undated, at unnumbered 1.

In October 2021, SCI-Frackville authorities contacted Trooper Andrew Letcavage ("Trooper Letcavage") of the Pennsylvania State Police to investigate the incidents, and provided him with copies of the misconduct reports. The Commonwealth subsequently charged Wilcox with multiple counts of indecent exposure and summary harassment, as well as one count of open lewdness. The matter proceeded to a bifurcated jury/non-jury trial,[4] during which the nurses and COs each testified that on numerous occasions while attempting to administer medication to Wilcox, he exposed himself to them by removing his penis from his jumpsuit and placing it in the wicket[5] of his jail cell. Similarly, the prison's psychological services specialist testified that on September 28, 2021, the most recent of the underlying alleged events,

_____

[4] We clarify that the jury considered the charges of indecent exposure and open lewdness, while the trial court thereafter considered the charges of summary harassment.

[5] A wicket, also known as a wicket door, is a small, secure opening in a jail or police cell door that allows guards to speak with or pass items to the detainee without fully opening the main door.

Wilcox called her over to his cell, only for him to begin masturbating in front of her once she engaged him in conversation. Trooper Letcavage testified that approximately one week following this incident, SCI-Frackville authorities contacted him to investigate each of these eight events. At the conclusion of trial, the jury convicted Wilcox of eight counts of indecent exposure and one count of open lewdness, and the trial court thereafter convicted him of eight counts of summary harassment. On September 8, 2022, the trial court imposed an aggregate sentence of two to four years' incarceration, concurrent to the sentence he was already serving. On October 10, 2023, this Court affirmed the judgment of sentence. **See Commonwealth v. Wilcox**, 307 A.3d 642 (Pa. Super. 2023) (unpublished memorandum). Wilcox did not seek further review by the Pennsylvania Supreme Court.

On August 29, 2024, Wilcox filed the instant timely *pro se* PCRA petition, his first.[6] The PCRA court thereafter appointed counsel, who filed an amended petition in which Wilcox argued, *inter alia*, that: (1) the Commonwealth intentionally withheld or destroyed evidence that consisted of a video

---

[6] Under the PCRA, a petition must be filed within one year of the date the judgment of sentence becomes final. **See** 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Pennsylvania Supreme Court, or the expiration of time for seeking such review. **See** 42 Pa.C.S.A. § 9545(b)(3). Here, because Wilcox did not seek review by the Pennsylvania Supreme Court, his judgment of sentence became final on November 9, 2023, thirty days after this Court affirmed his judgment of sentence. **See** Pa.R.A.P. 1113(a) (stating "a petition for allowance of appeal shall be filed . . . within [thirty] days after the entry of the order of the Superior Court . . ."). Thus, Wilcox had one year from this date, until November 9, 2024, to file his instant petition. As Wilcox filed the instant petition on August 29, 2024, it is timely.

- 4 -

recording of the underlying incident occurring on February 28, 2021;[7] and (2) his trial counsel, Hank Clarke, Esquire, ("Attorney Clarke"), was ineffective for not adequately pursuing arguments about the destruction of this evidence at trial. The PCRA court held an evidentiary hearing, during which it heard testimony from both Attorney Clarke and Wilcox. We provide relevant excerpts of this testimony, beginning with that provided by Wilcox, as follows:

> [PCRA Counsel]: All right. Now, on appeal[, one] issue, I believe, [was] with regards to a video and why it wasn't presented; is that correct?
>
> [Wilcox]: Correct.
>
> Q. Now, this video, did you have some kind of hearing in the prison you were at before?
>
> * * * *
>
> A. Yes.
>
> Q. And what was the problem with the videos at that hearing?
>
> A. They showed – they sent them the video of the incident, which wasn't the correct argument because I said I never got a misconduct [report]. So they had to send them another video of the officer putting a misconduct [report] in my door.
>
> Q. So in that hearing, the issue was about whether you were served; and they brought a video of what happened on the day in question. Is that correct?

---

[7] We reiterate that the Commonwealth alleged that Wilcox exposed himself to SCI-Frackville staff on this date by removing his penis from his jumpsuit and placing it in the wicket of his jail cell. For this alleged act, the Commonwealth charged him with indecent exposure and summary harassment, and the jury and trial court, respectively, convicted him of these crimes at the conclusion of his bifurcated trial.

A. Yep.

* * * *

[The Court]: Did you actually watch the video?

[Wilcox]: No. But I have paperwork. I got my sanction sheet.

* * * *

[The Court]: That wasn't my question. I want to know whether or not you actually watched the video.

[Wilcox]: No.

Q. Did you see a CD or a flash drive with any type of video on it?

A. No. This was all conversation during the hearing.

* * * *

[PCRA Counsel]: Did you give Attorney Clarke a copy of that paperwork from the [hearing?]

[Wilcox]: Yes.

* * * *

[PCRA Counsel]: So in this paperwork, it said it was determined that the video was for the wrong time frame; the inmate was served the misconduct at 22[:]17; and the video was from the time of the incident?

[Wilcox]: Correct.

* * * *

Q. [This paperwork] made you think there was [a video] because they referenced it; is that right?

A. Correct.

Q. And if that video was shown in court, would it have shown that you didn't do the acts you were accused of doing?

- 6 -

* * * *

A. Correct. There would be no video footage showing that.

Q. Because you didn't do it?

A. Right.

Q. And again, you told your attorney about your belief that they had a video; is that right?

A. Correct.

Q. And there was no video shown at trial?

A. No.

Q. That's all.

[The Court]: Was a video ever shown to you in the prison? It says here, [Wilcox] agreed to continue the hearing until video can be viewed.

[Wilcox]: The hearing examiner reviews the video.

Q. You don't review it?

A. No.

Q. Okay. Did you ask to review it?

A. I always ask to review it.

Q. But they don't let you because of department policy?

A. Right.

[PCRA Counsel]: But was that a video supposedly of you being served?

[Wilcox]: It was supposed to be a video of me being served the misconduct, but they sent the video of the incident. And then

they had to send another video of paperwork being slid into my door.

Q. Okay. So oddly enough, allegedly, the video that should have been here at trial was at your misconduct hearing?

A. Correct.

* * * *

[Commonwealth's Attorney]: But how do you know the video that would be related to the trial in this case was presented at your misconduct hearing if you didn't see it?

[Wilcox]: That's not my job. I just asked to check the video. And the hearing examiner told me that he checked the video, and he saw the video of the incident instead of the video of me not receiving any paperwork. Other than that, I have nothing to do with -- . . . that's their paperwork.

* * * *

Q. Did you have any discussion with Attorney Clarke about what the potential pitfalls would be if that video were to be produced?

A. Yeah, yeah, I did.

Q. What – in your mind, . . . were the potential pitfalls involved if that video were produced by the [DOC] and brought to trial?

A. It would be criminal activity upon the officers.

Q. Okay. When I say pitfall, I mean that it could hurt your case.

A. Oh, no, it wouldn't hurt my case.

Q. You never talked about how it could hurt your defense?

A. No, it wouldn't hurt my defense.

Q. Okay. So you would deny having a conversation with Attorney Clarke wherein you would have said, [m]aybe it's just a better idea not to go after these videos because it could hurt our defense?

A. No. I wrote him a letter asking for it.

Q. Okay.

A. And he asked for it, and they said there was no video.

Q. All right. Was that relayed to you by Attorney Clarke, that he tried to get the video and they told him there was no video?

A. Correct, in an e-mail.

N.T., 11/6/24, at 6-15.

We now provide relevant portions of Attorney Clarke's testimony, as follows:

[Commonwealth's Attorney]: . . . Attorney Clarke, would you give a summary of your level of experience in practicing criminal law?

[Attorney Clarke]: I've been practicing law for [fifteen] years, specifically criminal law the entire time [a]nd I've taken to date [fifty] criminal trials to verdict.

* * * *

Q. Did you review all of the discovery [in the instant case] that was provided as part of your preparation?

A. I did.

Q. Did you review it with . . . Wilcox?

A. I did.

Q. Now, there has been talk about a video of the episode that [Wilcox] obviously feels . . . would have exonerated him. Did you discuss the potential for this video with him as part of your trial prep?

A. Yes, from the beginning.

- 9 -

Q. Okay. And were any efforts made to obtain a video of this episode?

A. I believe that I sent a subpoena to the prison asking if there were any videos available.

[The Court]: If I remember correctly, there were a number of alleged incidents.

[Attorney Clarke]: There were. There were eight alleged incidents. So I asked –- because I know [Wilcox] did provide me with the [paperwork from] the one misconduct hearing that said that there was a video. So I inquired about videos alleging to all of the incidents, and I believe they said that there weren't any videos left.

[Commonwealth's Attorney]: Now, you had developed, I believe, a trial strategy in this case; is that also correct?

[Attorney Clarke]: I did.

Q. And what was, by way of summary, your trial strategy?

A. My trial strategy was this. . . . Wilcox never denied to me that any of these incidents occurred. What the talk about the videos was about was that he believed, and I believed rightly based on my experience with [the] DOC, that any videos of the potential [incidents] would have been destroyed by the time I got the case. So he wanted me to request the videos, see if there were any there, and then use the lack of videos at trial.

Now, what I advised him about very, very early on was, I said, [w]ell, it's a double-edged sword. If we request videos and they dig up these videos and [they] show that you actually did these things, well, then our trial strategy is very, very severely hurt because of the nature of the different allegations.

There were . . . eight different allegations, and [they] were of him exposing his penis each and every time but in a variety of different ways. . . .

I felt that if any of these videos were to be seen by a jury that that would be an immediate guilty verdict. And . . . my primary trial strategy was these are all medical professionals;

they're all nurses, doctors, and [COs] in a psychiatric unit within a prison; that part of the job of the [COs] and the medical personnel would be to be exposed to genitals, to body parts; and they would not be fazed.

The indecent exposures have an element in there that says that the person who sees the genitals have to be annoyed, alarmed, frightened, offended by these type of things; and I believed that the correct trial strategy would have been to say these nurses, doctors, and COs whose job it is to view these types of things and who are kind of immune to seeing genitals on a daily basis would not be alarmed, offended, frightened, [or] annoyed by seeing a penis.

* * * *

[The Court]: Circling back, Attorney Clarke, for me, you had mentioned your experience working with the DOC, because I know you've represented other state prisoners in the past, when there are video[s] of potential misconducts, is it your experience that they will erase [them] or it's just their procedure that eventually after a certain amount of time they get rid of them whether or not they plan on charging the Defendant pursuant to that misconduct?

[Attorney Clarke]: Yes, that is my experience.

Q. Okay. . . . the hearing date that would have indicated that a video at least existed at that time . . . is dated March 9, 2021. This case wasn't even filed until 2022, I don't believe.

A. That's correct.

Q. So in your experience, by the time they filed the charges, even if the video did exist at the . . . time, it would have been destroyed subsequently?

A. Correct.

[Commonwealth's Attorney]: . . . The concerns that you just talked about how a video might negate some of the medical argument that you would make towards the jury –

[Attorney Clarke]: Yes.

- 11 -

Q. – did you discuss those possibilities with . . . Wilcox prior to trial?

A. I did.

Q. [D]id the two of you arrive at a decision about how to proceed regarding these videos the DOC said they didn't have anymore?

A. Yes. So before I got confirmation that they didn't have them, the discussion that we had was just what I said, that if I request these videos and they have them and they present them, they're going to be used by the Commonwealth no doubt because if I went to the trouble to find them and they went to the trouble of digging them up, they're going to use them.

And if they show him exposing his penis, well, we have that. But then you also have the additional element of what I was talking about, annoyance, frightened, alarmed. You also have the reactions of the COs and the nurses. I didn't want to put any video evidence because if they did show stepping back or did show repulsion or anything like that, that would, again, hurt my argument.

Now, after we found out that there [weren't] any [videos], there was the argument of, [l]et's use the fact that they don't have it at trial. However, from my point of view, that would have required me putting . . . Wilcox on the stand as well. And that was something that we had talked about that we did not want to happen because . . . Wilcox would not have been a very good witness.

Q. [T]he discussion about putting him on the stand, did you go over that at length with him –-

A. Yes

Q. – the decision whether or not to testify?

A. Yes, because, again, I don't make it a habit to ask my clients whether they did something or not for the purpose of if I have to put them on the stand later on. Again, . . . Wilcox never denied [exposing himself] and said, I did not do this; these things never happened. He never said that to me.

- 12 -

In fact, during the preliminary hearing when I was cross-examining a lot of the officers and the nurses about the ways in which he exposed his penis and to find out if they were frightened or not, he spent the entire testimony laughing. And I felt like if I put him on the stand, . . . the jury might not think too much of him if he were to [display] that kind of behavior again. So our defense strategy was always he was not going to take the stand.

* * * *

Q. When you say about the need to use him to substantiate the claim that there . . . were videos but the videos were precluded by the [DOC], what would he have had to say in order to substantiate that?

A. He would have had to say that they didn't happen; that's why there [were] no videos, because they erased the videos because these things did not happen. And so the jury would have had to credibly believe they didn't happen and that's why the videos didn't exist.

* * * *

[The Court]: If the Commonwealth did have videos that exonerated . . . Wilcox, they would have the duty to turn those over to you as Defense counsel through discovery, correct?

[Attorney Clarke]: Absolutely.

Q. Do you remember if you filed an actual motion for discovery on this; or was it just an informal request, which is a part of the process?

A. Yeah. I don't believe that we had to because, again, Schuylkill County District Attorney's Office [("DA's Office")] is usually very prompt about turning over what they have[, s]o you just have to do an informal discovery request. And when they tell me, I'm not in possession of this, then usually what I'll do is go to DOC. And that's what we did in this case.

Q. And they told you the same thing, that, [w]e got rid of it?

A. Correct, or they didn't have it, not that they got rid of it.

- 13 -

Q. Okay. And you didn't expect them to have it at that point in time?

A. No.

\* \* \* \*

[PCRA Counsel]: So . . . the prison did answer your subpoena saying that they didn't have videos?

[Attorney Clarke]: I believe so, yes.

Q. And, of course, you asked [the DA's] Office; and they asked the troopers. And they didn't have any videos?

A. That's my understanding, yes.

Q. You don't know if [the DA's] Office directly asked the prison?

A. I have no idea.

N.T., 11/19/24, at 17-25, 27-28.

On February 4, 2025, after accepting briefs from both parties, the PCRA court entered the underlying order denying Wilcox's petition. Wilcox filed a timely notice of appeal, and both he and the PCRA court complied with Pa.R.A.P. 1925.[8]

Wilcox raises the following issues for our review:

1. Whether it was bad faith on behalf of the [Commonwealth] to destroy video evidence?

2. Whether Attorney Clarke was ineffective for not pursuing the disappearance of a prison video about the "incident[?"]

---

[8] In lieu of authoring a Rule 1925(a) opinion, the PCRA court directed this Court to the reasoning provided in its opinion that accompanied its denial order.

- 14 -

Wilcox's Brief at 4 (issues reordered).[9]

Our standard of review of an order denying a PCRA petition is well-settled:

> We review an order [denying] a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

In his first issue, Wilcox argues that the Commonwealth destroyed exculpatory video evidence in bad faith and in violation of his constitutional right to due process. When considering issues relating to the destruction of evidence in violation of a defendant's constitutional due process right, our Supreme Court adopted the following approach set out by the United States

---

[9] We note with disapproval that Wilcox did not divide the arguments in his brief "into as many parts as there are questions to be argued[, nor did he] have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein," as required by Pa.R.A.P. 2119(a). He instead inappropriately combined both of his issues into a single nonlinear section, simply titled "VII. Argument." Wilcox's Brief at 9-13.

Supreme Court in ***Illinois v. Fisher***, 540 U.S. 544 (2004), as the governing

standard:

> We have held that when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld. ***See Brady v. Maryland***, 373 U.S. 83, . . . (1963); [***see also***] ***United States v. Agurs***, 427 U.S. 97, . . . (1976). In [***Arizona v.***] ***Youngblood***, [488 U.S. 51 (1988),] by contrast, we recognized that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S., at 57 . . .. We concluded that the failure to preserve this "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." ***Id***.[] at 58 . . . (emphasis added).

***Commonwealth v. Snyder***, 963 A.2d 396, 405 (Pa. 2009) (quoting ***Fisher***,

540 U.S. at 547). Our Supreme Court clarified that when making the

distinction between whether evidence is "materially exculpatory" or

"potentially useful[,]" such a distinction cannot be made based on a "mere

assertion" that the evidence was exculpatory, and that such a classification

requires additional support. ***Snyder***, 963 A.2d at 405. Evidence is

"potentially useful" if "no more could be said than that it ***could*** have . . .

exonerated the defendant." ***Id***. at 406. (emphasis in original, citation

omitted). Pertinently, the ***Snyder*** court remarked that "it is very unlikely [to]

find bad faith where [potentially useful evidence is] destroyed pursuant to

standard procedure," and that even if the "evidence [were] destroyed outside

- 16 -

[of] standard procedure[, it] is not *ipso facto* destroyed in bad faith." ***Id***. (citation omitted).

Wilcox argues that the prison violated his rights when it destroyed video evidence of the alleged February 28, 2021 incident, as its "destruction [was] an extreme prejudice to [him given that] he has told us that he didn't do it[,] and the video would not show him doing it." Wilcox's Brief at 9. Wilcox maintains that because "[t]he State was both the 'victim' and the prosecutor[, it] should know the importance of evidence and should not have a policy of quickly destroying it, but rather preserving it." ***Id***. Indeed, Wilcox asserts that "[i]t is stunning that a state prison would not have a procedure to preserve evidence for criminal trials." ***Id***. Wilcox contends that "[w]ithout the video, he has no witnesses or evidence of his own[,] as everyone else present was a member of the[] State." ***Id***. As such, Wilcox claims that "[t]he only action which can redress this violation is a dismissal of the case because of the destruction of evidence[,] or a retrial with a proper instruction on missing evidence." ***Id***. at 9-10.

Additionally, although Wilcox acknowledges that the video would seem to only relate to the charges stemming from the February 28, 2021 incident, he argues "it is not enough to only dismiss [these] count[s] as that would ignore the reality that prison cameras are always running and there likely had been a video of all of the dates alleged." ***Id***. at 10. Wilcox therefore maintains that the "[d]estruction of [video] evidence is a deceitful practice, which will

only be stopped with serious consequences[,] such as the dismissal of this case." *Id*. Lastly, Wilcox claims that because "a video of the 'event' certainly is material[, as a] prison official could be subpoenaed on remand to confirm its destruction[,] as well as how many other videos existed and have since been destroyed[,] another avenue to address this violation is a new trial with a missing evidence instruction." *Id*. at 13.

The PCRA court considered Wilcox's first issue and determined that it was without merit, reasoning as follows:

> Here, there was no evidence presented by Wilcox to show that the video was destroyed in bad faith. Besides Attorney Clarke's testimony that in his experience in defending state prisoners, it seems to be DOC policy that video surveillance of alleged criminal acts are not saved, there was nothing further presented on the matter. These incidents began as misconducts within the prison, and it does not appear that the DOC contacted police to pursue charges until October of 2021. This alleged video took place on February 28, 2021. Nothing on the face of these facts present[s] any indication that the destruction of the video was done in bad faith. Furthermore, it is highly doubtful that the videos showed anything of value at all, considering the video would only be from outside of the cell from the hallway perspective rather than inside his cell door . . . where Wilcox is located for all of these alleged incidents.

PCRA Court Opinion, 2/4/25, at 4-5.

Viewing the record in the light most favorable to the Commonwealh as the verdict winner, we conclude that the PCRA court's determination — that SCI-Frackville's destruction of the prison's February 28, 2021 video footage did not violate Wilcox's constitutional due process rights — was supported by the record and without legal error. We reiterate that to succeed on this issue,

Wilcox needed to show either: (1) the video evidence was "materially exculpatory[,]" to the extent that, if available, it would have proven his innocence; or (2) that although the video evidence was only "potentially useful[,]" its destruction was the result of bad faith on behalf of the Commonwealth. *Snyder*, 963 A.2d at 405-06.

Initially, we determine that the record supports the PCRA court's determination that this surveillance footage would not have been materially exculpatory for purposes of this test. As the PCRA court pointed out, the surveillance footage Wilcox sought to have examined would only have captured the outside of his cell, from the hallway perspective, such that it would not have captured the alleged incidents of exposure occurring inside of his cell on February 28, 2021. *See* PCRA Court Opinion, 2/4/25, at 4-5. Pertinently, the disciplinary hearing report quoted above supports this determination, as the hearing examiner clarified that the surveillance footage did not show Wilcox actually receiving the underlying misconduct report from the CO, and instead had to infer such activity based on footage of the officer standing with paperwork "at [Wilcox's] door for [fifteen] seconds." Disciplinary Hearing Report, undated, at unnumbered 1. Additionally, we emphasize that after the hearing examiner viewed the surveillance footage, he concluded that the *misconduct report*, and not the video footage of the incident itself, was "more credible than [Wilcox's] denial that he [exposed] his penis . . . to female staff." *Id*. Accordingly, because Wilcox does not provide

any evidence that this video footage indeed captured the inside of his cell, where he had allegedly exposed himself, the record sufficiently supports the PCRA court's determination that it would not have been materially exculpatory.

Similarly, the record supports the PCRA court's determination that there was no evidence that the video was destroyed in bad faith. Crucially, Attorney Clarke testified that when he filed an informal discovery request with the DA's Office, who in his experience are "usually very prompt about turning over what they have[,]" the office informed him that neither itself nor any of its troopers were "in possession of" any of the surveillance footage. N.T., 11/19/24, at 27. Likewise, when Attorney Clarke thereafter directly subpoenaed the DOC for this footage, it also informed him that it "didn't have" the footage. *Id*. at 28. Relevantly, Attorney Clarke explained that this response was unsurprising to him based on his past experiences with the DOC while representing "other state prisoners in the past" where there were also "video[s] of potential misconducts," as "it's just [DOC] procedure that . . . after a certain amount of time they get rid of [the videos] whether or not they plan on charging the Defendant pursuant to that misconduct." *Id*. at 22. Accordingly, Attorney Clarke's testimony ultimately suggested that the Commonwealth never had access to the February 28, 2021 surveillance footage, and that SCI-Frackville authorities deleted this footage a few months after it had internally adjudicated the incident, and in accordance with its standard procedure.

Importantly, Wilcox does not point this Court to any evidence of record to show that the Commonwealth acted in bad faith to delete or suppress this footage. He instead solely infers the existence of bad faith based on his assertion that the Commonwealth knew of the footage's evidentiary value and should have had a policy to preserve it. Such an alleged inference cannot support a finding that the video footage would have been materially exculpatory or that the Commonwealth deleted it in bad faith. Accordingly, we conclude the record sufficiently supports the PCRA court's determination that Wilcox failed to establish that the absence of this footage at trial infringed upon his constitutional due process rights. *See Snyder*, 963 A.2d at 405-06. Thus, we hold that Wilcox's first issue is without merit.

Wilcox's second issue concerns whether his trial counsel rendered ineffective assistance. In assessing a claim of ineffective assistance under the PCRA, we presume that counsel has rendered effective assistance. *See Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021). To overcome the presumption, the petitioner must show that:

> (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Id*. (citation and quotation marks omitted). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. *See id*. Accordingly,

the failure to satisfy any one of these prongs will result in the rejection of the petitioner's ineffectiveness claim. *See id*.

Wilcox argues that although SCI-Frackville's documentation "references video of the incident[, and] Attorney Clarke believe[d] it was destroyed[, he maintains the] issue of spoilation could have been pursued on appeal, but Attorney Clarke chose not to do so." Wilcox's Brief at 10. Wilcox asserts that Attorney Clarke "chose not to pursue this issue because he claims the production of the same could have had a negative effect, such as showing the prison nurse's reaction." *Id*. "However, [Wilcox emphasizes that the nurse] testified to her reaction anyway[, and that a] video could have refuted her testimony." *Id*. Wilcox avers that "[s]ince Attorney Clarke believed the video was already destroyed, he could have pursued it without fear and appealed based on its spoilation." *Id*. at 10-11. Accordingly, Wilcox argues that because "[s]tate actors destroyed exculpatory evidence, violating his Constitutional 14th Amendment rights to due process[, and h]is [a]ttorney failed to adequately pursue arguments about the destruction of evidence, severely prejudicing [him, t]he case should be dismissed and his sentence vacated." *Id*. at 11.

The PCRA court determined that Wilcox's ineffectiveness claim was without merit, finding that "Attorney Clarke was reasonable in not pursuing [the destruction of evidence] issue further." PCRA Court Opinion, 2/4/25, at 5. As the court further explained:

While Attorney Clarke could have presented a defense emphasizing the Commonwealth's lack of video footage of any of the incidents despite having numerous security cameras in the facility, Attorney Clarke presented well-reasoned testimony concerning his trial strategy and the defense he pursued on behalf of his client. Rather than emphasize the lack of video footage, Attorney Clarke focused on the elements of the crimes committed and rigorously cross-examined the victims in an attempt to negate the element requiring offense or alarm. It is unlikely that focusing on the lack of video evidence would have made a significant impact in the case, where the sheer number of victims and their thorough, credible testimony would be very difficult to overcome. Attorney Clarke applied reasonable strategy in Wilcox's defense and unfortunately for Wilcox, the jury just did not agree with his position.

*Id*.

Based on our review of the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the PCRA court's determination — that Attorney Clarke's decision to refrain from pursuing arguments relating to the destruction of the February 28, 2021 video footage did not constitute ineffective assistance of counsel — was supported by the record and without legal error. Pertinently, Attorney Clarke relayed during the evidentiary hearing that he believed his pursuit of these videos at trial would have likely hurt Wilcox's case more than it could have helped, as it would have required Wilcox to testify in front of the jury — something they had both talked about extensively and agreed that they "did not want [to happen] because [Wilcox] would not have been a very good witness." N.T., 11/19/24, at 24. In defending this decision, Attorney Clarke additionally explained that: (1) "Wilcox [had] never denied" exposing himself to prison

staff during their many conversations; and (2) he feared that "the jury might not think too much of" Wilcox if he were to exhibit the same kind of behavior at trial as he did during the preliminary hearing, wherein Wilcox "spent the entire testimony laughing" while Attorney Clarke cross-examined the Commonwealth's witnesses. *Id*. As this testimony supports the existence of a reasonable basis behind Attorney Clarke's decision not to pursue the prison's surveillance footage at trial, we conclude that Wilcox failed to satisfy the second prong of the ineffectiveness test. *See Reid*, 259 A.3d at 405.

Moreover, because we determined, *supra*, that the destruction of this video footage did not violate Wilcox's constitutional right to due process, we similarly glean that Wilcox did not suffer any prejudice as required by the third prong of the ineffectiveness test. *See id*. Principally, even if Attorney Clarke complied with Wilcox's demands by raising this due process argument at trial, our above conclusion ultimately instructs that he would not have been entitled to any relief that could have altered the outcome of his trial. *See id*. Consequently, because we determine that Wilcox's ineffectiveness claim fails to satisfy both the second and third prongs of the ineffectiveness test, we hold that his second issue is also without merit.[10] *See id*.

---

[10] Although the PCRA court made no finding as it pertains to the third prong of the test for ineffectiveness, this Court may affirm on any basis appearing of record. *See Ford*, 44 A.3d at 1194.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/21/2025